*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| STATE OF ALASKA, DEPARTMENT OF NATURAL RESOURCES, | ) ) ) ) | Supreme Court Nos. S-16308/16417 (Consolidated) |
| Appellant and Cross-Appellee, | ) ) ) ) | Superior Court No. 3AN-10-04671 CI |
| v. | ) ) | O P I N I O N |
| ALASKAN CRUDE CORPORATION and JAMES W. WHITE, | ) ) ) | No. 7283 – August 31, 2018 |
| Appellees and Cross-Appellants. | ) ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Charles W. Ray, Jr., Judge.

Appearances: John C. Hutchins, Assistant Attorney General, and Jahna Lindemuth, Attorney General, Juneau, for Appellant and Cross-Appellee. James W. White, pro se, Houston, Texas, Appellee and Cross-Appellant. James B. Gottstein, Law Offices of James B. Gottstein, Anchorage, for Appellee and Cross-Appellant James W. White (limited appearance for oral argument). No appearance by Appellee and Cross-Appellant Alaskan Crude Corporation.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

MAASSEN, Justice.

# I.    INTRODUCTION

An oil and gas lessee conducted drilling activity on the last day of the lease term; the lease provided that such activity would extend the term. Two days later, however, the Department of Natural Resources (DNR) sent the lessee a notice that his lease had expired. The lessee suspended drilling activities and asked DNR to reconsider its decision and reinstate the lease.

DNR reinstated the lease several weeks later. The lessee, however, contended that the reinstatement letter added new and unacceptable conditions to the lease, and he pursued administrative appeals. Six months later DNR terminated the lease on grounds that the lessee had failed to diligently pursue drilling following the lease's reinstatement.

The superior court reversed DNR's termination decision, ruling that DNR had materially breached the lease by reinstating it with new conditions. Both DNR and the lessee appealed to this court. DNR asks us to affirm the termination of the lease, and the lessee asks us to remand to the agency for a determination of his damages.

We conclude that although DNR breached the lease in its notice of expiration, it cured the breach through reinstatement. And DNR's subsequent decision to terminate the lease is supported by substantial evidence that the lessee failed to diligently pursue drilling activities following reinstatement. Finally, we conclude that neither DNR nor the superior court erred in failing to address the lessee's damages claim. We reverse the superior court's decision reinstating the lease and affirm DNR's termination decision.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

On January 1, 2002, DNR and an individual lessee entered into a competitive oil and gas lease identified as ADL 389922, covering a 4,800-acre parcel near Cook Inlet. The lessee later assigned the lease to James W. White.[1] The lease had a primary term of seven years, but it also identified circumstances in which the term could be extended.

On the leased land was a plugged and abandoned well. It was White's intent to reenter and test this well, but reentry was prohibited by spacing regulations of the Alaska Oil and Gas Conservation Commission (AOGCC) because of the well's proximity to a property line. The AOGCC granted White an exception from the regulations, and in March 2005 it granted White a permit to reenter and test the well.

White began drilling in June 2007, but he soon suspended operations following the announcement that a fertilizer plant, his only prospective buyer, was about to close. On December 31, 2008, the last day of the seven-year lease term, a DNR inspector observed signs of activity at the drill site: the presence of a drill rig, the assembly of a blowout preventer, and completion of the initial reentry of the well plug.

### B.    Agency Actions And Proceedings

On January 2, 2009, DNR mailed White a notice of expiration, informing him "that in accordance with the lease agreement, ADL 389922 expired on December 31, 2008," and "[t]he case file has been closed in this office." White suspended operations and moved his equipment from the drill site. But on January 15 he wrote the Director

---

[1]    White is the President of Alaskan Crude Corporation, the operator of the lease. Alaskan Crude participated in the administrative and superior court appeals but does not participate in this appeal.

-3-                                                              7283

of the Division of Oil and Gas, asking him to clarify whether the expiration notice had been sent in error. White called the Director's attention to paragraph 4(c)(1) of the lease, which allowed extension of the lease if drilling had "commenced as of the date on which the lease otherwise would expire";[2] White asserted that he was drilling on the last day of the lease term, as witnessed by the DNR representative at the site. He claimed that the expiration notice was "a direct breach of [the] lease contract" and damaged his interests as lessee. He asked DNR to "please correct [the notice] and advise me by email before 2:00PM Friday, January 16th that the lease is still in effect." DNR did not immediately respond to White's letter.

On January 20 White appealed the expiration notice to the DNR Commissioner, seeking "reinstatement of the lease term" or an acknowledgment that the lease had not expired. White sent another letter to the Commissioner on January 26. Urging the Commissioner to make a decision, he asserted that DNR had "received ample documentation of prior well boring activities, along with video, eye witness testimony and photos of . . . setting the blowout preventer on December 31, 2008."

On January 27 the Commissioner retracted the expiration notice and reinstated the lease. The Commissioner found that White's documented activity on the last day of the lease term was "drilling" as defined in paragraph 34(4) of the lease and extended the lease under paragraph 4(c)(1). But the Commissioner advised White that

---

[2]    Paragraph 4(c)(1) provides in full:

If the drilling of a well whose bottom hole location is in the leased area has commenced as of the date on which the lease otherwise would expire and is continued with reasonable diligence, this lease will continue in effect until 90 days after cessation of that drilling and for so long as oil or gas is produced in paying quantities from the leased area.

the well had to be completed "within 90 days of this decision" or the lease would be automatically terminated. The Commissioner added: "After 90 days from the date of this letter, April 27, 2009, we will review your progress to determine whether continued lease extension is warranted." The Commissioner summarized:

> [T]he continued extension of the lease is contingent upon (1) continued drilling of the well; (2) completion of the well by April 27, 2009; (3) valid permits for all operations; and (4) sustained production within 90 days following the cessation of drilling. The failure to comply with any of these conditions will result in the automatic termination of this lease.

On February 11 White sought reconsideration of the reinstatement letter. He asserted that the letter's conditions on reinstatement were in fact attempts to unilaterally modify the original lease, and he asked the Commissioner to "remove any and all extra conditions included in [his] decision." Taking particular issue with the requirement that he complete the well by April 27, White warned that he could not drill once winter was over and would not "risk further capital and resources if the lease will expire if [he does] not finish the drilling operations before the arbitrary deadline."

On February 18 the Commissioner granted reconsideration and gave White the opportunity "to submit additional written material or request a hearing." The Commissioner advised White that during reconsideration the reinstated lease "remain[ed] in effect for [White] to pursue continued drilling operations." White declined a hearing but submitted another letter explaining his position in detail. On June 10 the Commissioner reaffirmed the January 27 reinstatement letter, explaining that the language White deemed a modification was simply a departmental interpretation of lease paragraph 4(c)(1) and governing law — AS 38.05.180(m) and 11 Alaska Administrative Code (AAC) 83.125. The Commissioner wrote that the April 27 deadline was his

interpretation of the lease requirement that drilling be completed with reasonable diligence and that it had been calculated by trebling the 30-day estimate White gave in his own original plan of operations. Responding to White's argument that DNR "could not require that he bring the completed well into production within 90 days after drilling ends," the Commissioner stated that "the 90 day requirement is clearly set forth in AS 38.05.180(m) and [the] lease."[3]

Six weeks later, by letter from the Director of the Division of Oil and Gas dated July 23, 2009, DNR terminated White's lease for "two independent reasons": first, because "according to the AOGCC, Mr. White [did] not have a valid drill permit"; and second, because "White did not continue to diligently drill after the lease was re-instated on January 27, 2009." The Director explained that DNR had attempted to confirm White's drilling activities and permit status following the reinstatement. DNR had sent White letters, and White had responded but without answering DNR's specific questions. DNR eventually learned that the AOGCC had terminated White's drilling permit, an action White was appealing.

White appealed the termination of his lease to the Commissioner, asking that it again be reinstated. After some procedural delay not relevant here, White was granted an administrative hearing presided over by the Deputy Commissioner. White asked for "reinstatement of ADL 389922 lease terms, or alternatively an acknowledgment from DNR that the lease term did not expire as stated in a letter dated

---

[3]    *See* AS 38.05.180(m) ("If drilling, including operations such as redrilling, sidetracking, or using other means necessary to reach the originally proposed bottom hole location, has commenced on the expiration date of the primary term of the lease and is continued with reasonable diligence, the lease continues in effect until 90 days after drilling has ceased and for so long thereafter as oil or gas is produced in paying quantities."); lease ¶4(c)(1), quoted *supra* note 2.

January 2nd, 2009, and also an order dated July 23rd, 2009." The Deputy Commissioner's decision affirmed termination of the lease.

White appealed to the superior court. The court ordered a remand for a new administrative hearing on the ground that DNR violated White's due process rights when one of its attorneys, having initially advised DNR on White's administrative appeal, then advised the Deputy Commissioner in her role as hearing officer. To provide guidance on remand the superior court also addressed the terms of the January 2009 reinstatement letter and the AOGCC permit. The superior court directed DNR that it could not terminate White's lease based on the permit's validity before the AOGCC had finally decided that issue. As for the reinstatement letter, the court interpreted its four conditions as not imposing "new conditions or unilateral amendments . . . . Instead, DNR appears to be reminding White of his obligations under the lease." The court directed the agency on remand to review White's efforts after reinstatement "to determine if he continued drilling with reasonable diligence" based on the totality of the circumstances, stressing that failure to meet the April 27 deadline alone was insufficient to show a lack of reasonable diligence.

On remand, following a second administrative hearing before a different hearing officer, the Commissioner again upheld DNR's termination of the lease. The Commissioner explained that White "did not demonstrate that [he] continued to drill with reasonable diligence or . . . failed to drill for reasons demonstrating reasonable diligence within the totality of the circumstances."

White again appealed to the superior court, where the case was heard by a different superior court judge.[4] After briefing and argument, the court ruled that DNR's

---

[4]      The appeal before remand was heard by Superior Court Judge Mark

(continued...)

January 2009 notice of expiration was a material breach: "An unjustified, outright cancellation of a contract cannot be other than a 'material breach.'" The court further determined, contrary to the court's analysis in the first appeal, that the breach was not cured by DNR's reinstatement of the lease 25 days later; the court reasoned that the reinstatement letter's requirement for "sustained production within 90 days following cessation of drilling" fundamentally conflicted with paragraph 4(d) of the lease, which allows a lessee at least six months after notice to bring "a well capable of producing oil or gas in paying quantities" into production.[5] The court interpreted the lease as requiring "reasonableness and diligence, not deadlines," especially deadlines resulting in automatic termination if not met. The court held that DNR's material breach relieved White of his own lease obligations, and it therefore ordered that the lease be reinstated for a reasonable time for White "to resume, and then diligently continue, drilling in accordance with the Lease." The court declined to address White's damage claims, noting that "[w]hether other remedies are in order was not addressed by the parties."

Both parties appealed to this court.[6]

---

[4]     (...continued)
Rindner. The appeal following the second administrative hearing was heard by Superior Court Judge Charles W. Ray, Jr.

[5]     Paragraph 4(d) provides: "If there is a well capable of producing oil or gas in paying quantities on the leased area, this lease will not expire because the lessee fails to produce that oil or gas unless the state gives notice to the lessee, allowing a reasonable time, which will not be less than six months after notice, to place the well into production, and the lessee fails to do so. If production is established within the time allowed, this lease is extended only for so long as oil or gas is produced in paying quantities from the leased area."

[6]     White filed a motion for reconsideration of the superior court's order, arguing that the issue of damages should have been remanded to the agency. The
(continued...)

## III. STANDARDS OF REVIEW

We "independently review the merits of an administrative determination."[7]

We have "recognized four principal standards of review for administrative decisions: (1) the substantial evidence standard applies to questions of fact; (2) the reasonable basis standard applies to questions of law involving agency expertise; (3) the substitution of judgment standard applies to questions of law where no expertise is involved; and (4) the reasonable and not arbitrary standard applies to review of administrative regulations."[8]

"Questions of contract interpretation generally raise questions of law that we review de novo."[9] "Under this standard, we exercise our independent judgment, substituting it 'for that of the agency even if the agency's [interpretation] ha[s] a reasonable basis in law.' "[10] We will "adopt the rule of law that is most persuasive in

---

**6** (...continued) superior court denied reconsideration after White filed a motion asking that it refrain from ruling until we decided DNR's appeal.

**7** *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992).

**8** *Alaskan Crude Corp. v. State, Dep't of Nat. Res., Div. of Oil & Gas*, 261 P.3d 412, 419 (Alaska 2011) (quoting *Pasternak v. State, Commercial Fisheries Entry Comm'n*, 166 P.3d 904, 907 (Alaska 2007)).

**9** *Id.* (quoting *Beal v. McGuire*, 216 P.3d 1154, 1162 (Alaska 2009)); *Exxon Corp. v. State*, 40 P.3d 786, 792 (Alaska 2001) ("Interpretation of a contract is a question of law that is not within the department's special expertise or skill.").

**10** *City of Valdez v. State*, 372 P.3d 240, 246 (Alaska 2016) (alterations in original) (quoting *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987)).

light of precedent, reason and policy."[11]

However, notwithstanding the usual substitution of judgment standard for questions of contract interpretation, we have applied the reasonable basis standard of review to agency interpretations of specialized contract terms derived from statutes or regulations.[12]

## IV.    DISCUSSION

DNR appeals the superior court's decision that it must reinstate White's lease, arguing that neither the January 2009 notice of expiration nor the subsequent reinstatement letter was a material breach of the lease.  White's appeal argues that the superior court erred by failing to remand the issue of his damages to the agency for a determination of what he is owed.

### A.    The Commissioner Did Not Err In His 2013 Decision Affirming Termination of the Lease.

We agree with the superior court that DNR's January expiration notice materially breached the lease, but we conclude that the breach was cured by the

---

[11]    *Thoeni v. Consumer Elec. Servs.*, 151 P.3d 1249, 1253 (Alaska 2007).

[12]    *See Alaskan Crude Corp.*, 261 P.3d at 419 (applying reasonable basis standard when interpreting force majeure clause because force majeure was defined in DNR regulations); *ConocoPhillips Alaska, Inc. v. State, Dep't of Nat. Res.*, 109 P.3d 914, 920-21 (Alaska 2005) (applying reasonable basis standard when interpreting royalty rights clause subject to administrative process defined in regulations); *N. Alaska Envtl. Ctr. v. State, Dep't of Nat. Res.*, 2 P.3d 629, 633 n.12 (Alaska 2000) ("[W]here the agency interprets technical or esoteric terminology, we have applied reasonable basis review." (citing *Pan Am. Petroleum Corp. v. Shell Oil Co.*, 455 P.2d 12, 20-22 (Alaska 1969))).  "Examples of such terms we have deemed to be non-technical include 'adjacent to,' 'local authorized planning agencies,' 'disposal,' 'interest in land,' and 'revocable.' " *City of Valdez*, 372 P.3d at 247 (first quoting *State v. Aleut Corp.*, 541 P.2d 730, 736-38 (Alaska 1975); and then quoting *N. Alaska Envtl. Ctr.*, 2 P.3d at 633).

reinstatement letter. Thereafter, White continued to have the contractual duty to engage in drilling operations with reasonable diligence; the Commissioner's decision that he failed in that duty is supported by substantial evidence.

### 1. The expiration notice breached the lease.

Paragraph 4(c)(1) of the lease obligated DNR to extend the lease if White was engaged in drilling operations on December 31, 2008. DNR does not dispute that White satisfied this condition and that it was therefore obligated to extend the lease. But DNR sent White a letter on January 2, 2009, announcing without further explanation that the lease had expired. DNR argues both that the expiration notice was not a breach and that, if it was, the breach was not material.

DNR contends that the expiration notice could not be a breach because it "had no language suggesting that the [S]tate would not perform." We conclude, however, that any other reading of the notice is unreasonable. "When performance is due, . . . anything short of full performance is a breach, even if the party who does not fully perform was not at fault and even if the defect in his performance was not substantial."[13] The expiration notice stated perfunctorily that the lease had "expired" and DNR had closed its "case file." The notice clearly contemplated no further action by DNR. The hearing officer at the second administrative hearing found that White's actions in response to the notice — removing his equipment "from the drilling site to a different, presumably off-lease site location" — were "not unreasonable . . . in the sense of vacating a lease which had apparently been terminated."[14] And DNR's later actions

---

[13]     RESTATEMENT (SECOND) OF CONTRACTS § 235 cmt. b (AM. LAW INST. 1981).

[14]     *See* 58 C.J.S. *Mines and Minerals* § 337, Westlaw (database updated (continued...)

in "retract[ing]" the expiration notice and "reinstat[ing]" the lease would not have been necessary had DNR actually viewed the lease as continuing in effect.

DNR asserts that the expiration notice was only an "anticipatory breach," not "sufficiently positive" to show that DNR had no intent to perform its obligations as they came due.[15] The law of anticipatory breach applies when a party repudiates a contract, evidencing the intent to breach the contract before the party needs to perform.[16] As factors weighing against a finding of repudiation, DNR points to the notice's language, the fact it was signed by a junior employee (a "Natural Resource Specialist"), and the lessee's contractual right to appeal.

As noted above, we conclude that the notice's language — advising that the lease had "expired" and that "[t]he case file has been closed" — "[is] sufficiently positive to be reasonably interpreted to mean" that DNR was not extending the lease.[17] This was

---

[14]      (...continued)
Mar. 2018) ("[R]epudiation of an oil and gas lease by a lessor relieves the lessee of any obligation to conduct any operation on the land in order to maintain the lease in force pending a judicial resolution of the controversy between the lessee and the lessor over the validity of the lease." (citing *Teon Mgmt., LLC v. Turquoise Bay Corp.*, 357 S.W.3d 719, 730 (Tex. App. 2011))).

[15]      *See K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 715 (Alaska 2003) ("To be a repudiation, 'a party's language must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform.' " (quoting RESTATEMENT (SECOND) OF CONTRACTS § 250 cmt. b (AM. LAW. INST. 1981))).

[16]      *Repudiation*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "repudiation" as "[a] contracting party's words or actions that indicate an intention not to perform the contract in the future; a threatened breach of contract"); *see Drake v. Wickwire*, 795 P.2d 195, 198 (Alaska 1990) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 253(1) (AM. LAW. INST. 1981)).

[17]      *See K & K Recycling, Inc.*, 80 P.3d at 715 (quoting RESTATEMENT (continued...)

-12-                                                        **7283**

"a clear, unequivocal challenge to [White's] title to an interest in the lease" and thus a repudiation.[18]

The fact that the notice was signed by a junior employee does not change this conclusion. Indeed, DNR does not argue that the signing employee lacked the necessary authority. Arguing that White should nonetheless have viewed the notice as something less than final, DNR points to lease paragraph 24, which identifies the Director of the Division of Oil and Gas as the authorized agent "for purposes of administering this lease." But "[a] notification given by an agent is effective as notification given by the principal if the agent has actual or apparent authority to give the notification."[19] "Apparent authority to do an act is created as to a third person when a principal's conduct, reasonably interpreted, 'causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.' "[20]

---

[17]    (...continued)
(SECOND) OF CONTRACTS § 250 cmt. b (AM. LAW. INST. 1981)); *Expire*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("Expire" means "to be no longer legally effective; to become null at a time fixed beforehand").

[18]    *See* 58 C.J.S. *Mines and Minerals*, Westlaw (database updated Mar. 2018) (citing *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 239 (Tex. App. 1994)).

[19]    RESTATEMENT (THIRD) OF AGENCY § 5.02(2) (AM. LAW. INST. 2006).

[20]    *Airline Support, Inc. v. ASM Capital II, L.P.*, 279 P.3d 599, 604-05 (Alaska 2012) (quoting *Askinuk Corp. v. Lower Yukon Sch. Dist.*, 214 P.3d 259, 264 (Alaska 2009)). "We consider three factors when evaluating apparent authority: '(1) the manifestations of the principal to the third party; (2) the third party's reliance on the principal's manifestations; and (3) the reasonableness of the third party's interpretation of the principal's manifestations and the reasonableness of the third party's reliance.' " *Id.* at 605 (quoting *Askinuk Corp.*, 214 P.3d at 264).

The expiration notice was sent on DNR's official stationery; it was sent following DNR's on-site inspection of White's drilling activity on December 31, 2008; and most importantly, as the second hearing officer found, it was "not unreasonable" for White to rely on the notice when he ceased drilling and removed his equipment from the well site. The hearing officer's unchallenged finding leads us to the conclusion that the DNR employee who signed the expiration notice had at least the apparent authority to do so.

Finally, DNR argues that the expiration notice could not be an anticipatory breach because the lease provided that such a notice could be appealed.[21] But the right to appeal does not change the nature of the act from which the appeal is taken. A breach can be cured, but that does not mean it was never a breach.

### 2. DNR's breach was material.

Whether DNR's breach was material is another question. Although the agency hearings were the only forums for fact-finding in these administrative proceedings, they resulted in no specific findings on materiality. On the first superior court appeal, however, the court assumed that DNR had materially breached the lease before going on to consider whether DNR cured the breach through reinstatement. On the second superior court appeal, the court expressly decided that "DNR's breach was material. . . . An unjustified, outright cancellation of a contract cannot be other than a 'material breach.' "

---

[21] Paragraph 25(c) of the lease allows White, as the first step in the administrative appeal process, to appeal a notice within 30 days of its receipt. *See* 11 AAC 02.010(e) (incorporating appeal period "set by 11 AAC 02.040"); 11 AAC 02.040(a) (setting appeal deadline of 20 days "unless another period is set by . . . [an] existing contract").

We agree with the superior courts' view that DNR's breach was necessarily material. DNR correctly points out that whether a breach is material is a question "of degree, centering on the reasonable expectations of the parties, and a material breach is one that will or may result in the other party not receiving substantially what that party bargained for."[22] And ordinarily the question of materiality must be left to the fact-finder.[23] But in some cases the breached provision is so obviously central to the purpose of the contract that materiality can be determined as a matter of law.[24] We conclude that

---

[22]     *See* RESTATEMENT (SECOND) OF CONTRACTS § 241 (AM. LAW INST. 1981) (listing circumstances that are "significant" to "determining whether a failure to render or to offer performance is material," including "the extent to which the injured party will be deprived of the benefit which he reasonably expected"; "the extent to which the injured party can be adequately compensated" for the lost benefit; the extent to which the non-breaching party "will suffer forfeiture"; the likelihood that the non-breaching party "will cure his failure, taking account of all the circumstances including any reasonable assurances"; and "the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing").

[23]     *See Wirum & Cash, Architects v. Cash*, 837 P.2d 692, 708 (Alaska 1992) (remanding for superior court to "enter additional findings and conclusions as to whether [partner's] various breaches [of fiduciary duties] were material breaches of the parties' contract" excusing other partner's performance); 14 RICHARD A. LORD, WILLISTON ON CONTRACTS § 43.6, at 627 (4th ed. 2012) ("[W]hether a nonperformance is sufficiently material [to suspend or discharge the other party's duty to perform] is ordinarily an issue of fact.").

[24]     *See* 23 LORD, *supra* note 23, § 63.3, at 485 ("Nevertheless, the materiality of a breach of contract is not always a question of fact, even if the issue is disputed; thus, if there is only one reasonable conclusion, a court must address what is ordinarily a factual question as a question of law."); *cf. Gilbert v. Dep't of Justice*, 334 F.3d 1065, 1071-72 (1st Cir. 2003) (explaining that whether breach is material is mixed question of law (what contract requires) and fact (what breaching party did); so that "[w]here, as here, the facts are undisputed, the determination of whether there has been material non-compliance with the terms of a contract, and hence breach, necessarily reduces to a
(continued...)

the breach at issue here, resulting in termination of the lease and prompting White to reasonably suspend his own performance while awaiting reinstatement, affected rights so central to the parties' reasonable expectations that it could only be viewed as material.

### 3.    Reinstatement of the lease cured the breach.

The Commissioner retracted the expiration notice and reinstated the lease in his January 27, 2009 letter. White asserts that the reinstatement letter added new conditions to the lease, amounting to another breach. It is true that "language that clearly manifests an 'intention not to perform except on conditions which go beyond the contract' " may be a repudiation.[25]  A demand that new conditions be met, even if based on "an alleged 'contract interpretation,' " may be an anticipatory breach.[26]

In support of this argument, White refers to the letter's paragraph that begins "in summary" and lists four conditions for "the continued extension of the lease": "(1) continued drilling of the well; (2) completion of the well by April 27, 2009; (3) valid

---

[24]    (...continued)
question of law"); *Alaska Interstate Constr., LLC v. Pacific Diversified Invs., Inc.*, 279 P.3d 1156, 1173 (Alaska 2012) (recognizing rule "that fraud and other forms of intentional wrongdoing constitute material breaches of contract as a matter of law").

[25]    *K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 715 (Alaska 2003) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 250 cmt. b (AM. LAW INST. 1981)); *see also* 10 JOHN E. MURRAY, JR., CORBIN ON CONTRACTS § 54.15, at 200 (Joseph M. Perillo ed., rev. ed. 2014) ("If one party to a contract, either willfully or by mistake, demands of the other a performance to which he has no right under the contract and states definitely that, unless his demand is complied with, he will not render his promised performance, an anticipatory breach has been committed. Such a repudiation is conditional in character, it is true; but the condition is a performance to which the repudiator has no right.").

[26]    *Snow v. W. Sav. & Loan Ass'n*, 730 P.2d 204, 210 (Ariz. 1986) (en banc) (quoting *United Cal. Bank v. Prudential Ins. Co. of Am.*, 681 P.2d 390, 430 (Ariz. App. 1983)).

permits for all operations; and (4) sustained production within 90 days following the cessation of drilling." White contends that the first condition — "continued drilling of the well" — conflicts with lease paragraph 4(e), which gives the lessee a reasonable time to recommence "operations or production" if the State "directs or approves in writing a suspension of all operations on or production from the leased area" and then lifts the suspension. But White sought and was granted the extension under paragraph 4(c)(1), not paragraph 4(e). And we read paragraph 4, subsections (a) through (f), as addressing usually distinct circumstances:

* Subsection (a) provides automatic lease extensions while oil or gas is being produced in paying quantities.

* Subsection (b) provides automatic lease extensions for leases committed to State-approved unit agreements.

* Subsection (c) provides automatic lease extensions under two scenarios: (1) if drilling has commenced "as of the date on which the lease otherwise would expire and is continued with reasonable diligence"; and (2) if the lease was producing "oil or gas in paying quantities," production ceases, but "drilling or reworking operations are commenced . . . within six months after cessation of production and are prosecuted with reasonable diligence."

* Subsection (d) addresses leases with wells "capable of producing oil or gas in paying quantities"; leases encompassing such wells will not expire despite the lack of production unless the State gives the lessee notice "allowing a reasonable time, which will not be less than six months after notice, to place the well into production."

* Subsection (e) addresses leases subject to State orders to suspend operations or production; lessees have "a reasonable time, which will not be less than six

-17- **7283**

months after notice that the suspension has been removed, to resume operations or production."

       \* Subsection (f) addresses leases on which operations or production have been "prevented by force majeure."

       The circumstances of White's lease extension fall squarely within paragraph 4(c), which is why he adamantly — and successfully — argued to DNR for that provision's application. White was conducting drilling activities on December 31, 2008, the date the lease would otherwise have expired, and his lease term therefore extended automatically as long as his drilling activities were "continued with reasonable diligence." He did not suspend operations because of a written DNR order that he do so, as contemplated by paragraph 4(e). Another lease provision gives DNR an apparently broad authority to "from time to time direct or approve in writing suspension of production or other operations under this lease." But a suspension implies a mere interruption in performance, not an end to it,[27] and fitting this case within the framework of paragraph 4(e) thus cuts against White's central argument that the January expiration notice terminated his lease. Indeed, White argues inconsistently on this appeal that "DNR did not suspend operations on [the lease], they terminated it."

       Moreover, subsections 4(c) and (e) cannot reasonably be read as governing the same situation simultaneously. Paragraph 4(c) requires that the lessee "*continue*[] with reasonable diligence" the drilling activities engaged in on the last day of the lease term (emphasis added); paragraph 4(e) allows the lessee "not . . . less than six months

---

[27]     "Suspend" means "[t]o interrupt; postpone; defer," or "[t]o temporarily keep (a person) from performing a function . . . or exercising a right or privilege." BLACK'S LAW DICTIONARY (10th ed. 2014).

after notice" to *resume* such activities, having discontinued them because of the suspension order.

Addressing the second condition in DNR's reinstatement letter — "completion of the well by April 27, 2009" — White contends that it conflicts with the language of paragraph 4(c)(1) that automatically extends the lease for as long as the lessee continues drilling activities "with reasonable diligence." The State counters that the reinstatement letter "simply voiced a reasonable interpretation of when drilling with 'reasonable diligence' would be complete as provided in the lease"; in other words, diligent effort that fails to complete the well by April 27 could not, in the Commissioner's view, be "reasonable." We agree with White that a fixed deadline seems inconsistent with a flexible, fact-based completion standard like the contractual term "with reasonable diligence"; a lessee acting "with reasonable diligence" could fall short of a fixed deadline for a variety of reasons.[28]

On the other hand, we must give some deference to the Commissioner's decision as to what constitutes "reasonable diligence" in this highly specialized context. Although the interpretation of a contract presents a question of law, we review questions that necessarily involve agency expertise under the "reasonable basis" test, "giving deference to the agency's specialized knowledge and expertise."[29]

---

[28]     *See Diligence*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "reasonable diligence" as "[a] fair degree of diligence expected from someone of ordinary prudence under circumstances like those at issue").

[29]     *Alaska Fish & Wildlife Conservation Fund v. State, Dep't of Fish & Game, Bd. of Fisheries*, 289 P.3d 903, 912 n.31 (Alaska 2012) (quoting *Alaska Exch. Carriers Ass'n v. Regulatory Comm'n*, 262 P.3d 204, 208-09 (Alaska 2011)).

Here, the Commissioner explained his interpretation of the "reasonable diligence" standard in his June 10, 2009 decision on White's request that DNR reconsider the reinstatement letter. The Commissioner recited White's description of the activities he had already done to prepare the well for drilling, including completion of a "120 foot water well with a pump to provide water" and the staging of "the workover rig, blow out preventer, mud tanks, drill pipe and other major equipment necessary and incidental to reach the proposed bottom hole location." The Commissioner noted his reliance on paragraph 4(c)(1) of the lease and the legal sources from which it was derived, AS 38.05.180(m) and 11 AAC 83.125, as well as the lease's expansive definition of "drilling." He explained that the April 27 deadline — 90 days from the date of the reinstatement letter — had been extrapolated from "White's Plan of Operations, which stated that it would take 30 days to complete this well."[30] The Commissioner trebled White's own estimate. This interpretation, the Commissioner summarized, was based on "the lease language consistent with the terms set forth in state law, in paragraph 4 of the lease and Mr. White's own representations about his plans."

The Commissioner correctly observed that the contractual "reasonable diligence" standard is drawn directly from statute and regulation: AS 38.05.180(m)[31] and

---

[30] The lease required that the plan of operations set out "the sequence and schedule of operations to be conducted[,] including the date operations are proposed to begin and their proposed duration," and that the plan be submitted and approved "before any operations may be undertaken."

[31] "If drilling, including operations such as redrilling, sidetracking, or using other means necessary to reach the originally proposed bottom hole location, has commenced on the expiration date of the primary term of the lease and is continued with *reasonable diligence*, the lease continues in effect until 90 days after drilling has ceased and for so long thereafter as oil or gas is produced in paying quantities."
(continued...)

11 AAC 83.125.[32]   In *Alaskan Crude Corp. v. State, Department of Natural Resources, Division of Oil & Gas*, we considered what standard of review applied to the interpretation of a force majeure clause.[33]   The parties disputed whether the agency applied the force majeure clause from the oil and gas lease or the unit agreement:  if it was from the lease it was subject to de novo review as a matter of contract interpretation, but if it was from the unit agreement it was subject to deference as the agency's interpretation of its own regulation.[34]   We concluded that the agency applied the force majeure clause from the unit agreement and its decision was subject to deference because "[t]he definition of force majeure [in] the unit agreement is contained in DNR regulations."[35]   In this case, similarly, we conclude that the Commissioner strived in his reconsideration decision to interpret the contractual term "reasonable diligence" consistently with its sources in statute and regulation.  We conclude that, as in *Alaskan Crude*, the Commissioner's interpretation of the "reasonable diligence" standard was "an

---

[31]   (...continued)
AS 38.05.180(m) (emphasis added).

[32]   "If drilling, including redrilling, sidetracking, or other means necessary to reach the originally proposed bottom hole location, has commenced on or before the expiration date of the primary term of the lease and is continued through that date with *reasonable diligence*, the lease will continue in full force until 90 days after the drilling has ceased and for so long after that date as oil or gas is produced in paying quantities." 11 AAC 83.125(a) (emphasis added).

[33]   261 P.3d 412, 419 (Alaska 2011).

[34]   *Id.*

[35]   *Id.* (citing 11 AAC 83.395(3)).

interpretation of the agency's own regulations and the deferential reasonable basis standard applies."[36]

Relatedly, we have also applied the reasonable basis standard to terms that are flexible and evolving rather than immutable and subject to one fixed definition, and thus more susceptible to determination as a matter of law. In *ConocoPhillips Alaska, Inc. v. State, Department of Natural Resources*, we held that "the crucial question" for us in interpreting a regulatory standard incorporated into an oil and gas lease was "whether this standard describe[d] a fixed and immutable test" — which "might well present a pure question of law to be decided de novo" — or whether it described instead "a more flexible process . . . grounded in the department's exercise of discretion and expertise and having the capacity to evolve as contemporary scientific knowledge advances," in which case our review "would need to be appropriately deferential."[37] Finding that the standard was flexible and evolving, we deferred to the Commissioner's interpretation of it.[38] The concept of "reasonable diligence" in the context of well-drilling activities strikes us as flexible enough to require similarly deferential review.

In support of the Commissioner's interpretation we note that the reinstatement letter advised White not only that he had an additional 90 days to complete the well or face "automatic termination of this lease" but also that after 90 days DNR would "review [White's] progress to determine whether continued lease extension [was]

---

[36]     *Id.*

[37]     109 P.3d 914, 920 (Alaska 2005).

[38]     *Id.* at 921-23.

warranted."[39]  We note also that White continued to have the protection of the force majeure clause in paragraph 4(f) of the lease, by which he could seek further extensions if his failure to meet the April 27 deadline was due to causes "beyond [his] reasonable ability to foresee or control."[40]  Under our deferential standard of review, we conclude that the Commissioner's decision that White could complete drilling within 90 days — by April 27, 2009 — if he exercised "reasonable diligence" has a reasonable basis in the facts, the terms of the lease, and the law; we therefore do not disturb it.

White also challenges the reinstatement letter's third condition — "valid permits for all operations" — as allowing DNR to terminate the lease "on the erroneous basis that the Lessee [does] not have a valid drilling permit."  But he does not argue that a requirement of "valid permits" is inconsistent with the lease; indeed, any permit required by statute or regulation is also required by the lease, which is expressly made "subject to all applicable state and federal statutes and regulations in effect on the effective date of this lease" and, "as is constitutionally permissible," laws enacted later as well.

Finally, White challenges the last condition — "sustained production within 90 days following the cessation of drilling" — as contrary to lease paragraph 4(d), which allows a lessee "a reasonable time, which will not be less than six months after notice,"

---

[39]     *See K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 715 (Alaska 2003) ("[T]o be an anticipatory breach based on a request for additional conditions, 'the request must be coupled with an absolute refusal to perform unless the request is granted.' " (quoting 17A AM. JUR. 2d *Contracts* § 738, at 752 (1991))).

[40]     *See* 11 AAC 83.395(3) (" '[F]orce majeure' means war, riots, acts of God, unusually severe weather, or any other cause beyond the unit operator's reasonable ability to foresee or control and includes operational failure to existing transportation facilities and delays caused by judicial decisions or lack of them.").

to place into production "a well capable of producing oil or gas in paying quantities." But as explained above, the subsections of paragraph 4 address different circumstances, and White's circumstances, as he argued consistently himself, fit paragraph 4(c)(1): that is, as long as his drilling activities were "continued with reasonable diligence, [the] lease [would] continue in effect until 90 days after cessation of that drilling and for so long as oil or gas [was] produced in paying quantities." Paragraph 4(d) addresses wells that are *already* "capable of producing oil or gas in paying quantities." A lessee with such a well, but who is not producing, has at least six months to commence production once DNR gives notice that production is required. But White has no such well under the lease here at issue. A lessee like White — who extends the lease term by drilling activities on the last day of the term — must continue drilling "with reasonable diligence," must commence production within "90 days after cessation of that drilling," and will maintain the lease only "for so long as oil or gas is produced in paying quantities." The reinstatement letter's fourth condition merely restates the requirements of lease paragraph 4(c)(1), the provision governing White's extension.

We conclude that the Commissioner did not err when he decided that the reinstatement letter did not impose new conditions on DNR's continued performance under the lease but rather interpreted or applied the lease's terms.

### 3. DNR's termination of the lease was supported by substantial evidence.

Because we conclude that DNR's January 2009 breach was cured by reinstatement, we next consider whether DNR was justified in terminating the lease in July. White argues that DNR's justifications for termination — lack of both a valid drilling permit and drilling activity — were flawed. In White's first superior court appeal, the court agreed with White about the valid drilling permit, concluding that it did

not justify termination as long as the validity was the subject of a pending administrative appeal with AOGCC. But on remand the Commissioner relied solely on White's failure "to drill with reasonable diligence." On appellate review, our task is to determine whether the Commissioner had substantial evidence to support the finding that White did not drill with reasonable diligence.[41]

We conclude that the Commissioner's decision is adequately supported. His decision related the following facts. On December 31, 2008, DNR's representative at the drill site observed some activities short of "actual boring" that nonetheless qualified as "drilling activities" sufficient to extend the lease term. On January 2, 2009, upon receipt of the notice of expiration, White demobilized his equipment and removed it from the well site to "hard ground."[42] A few weeks later, in the midst of White's attempts to have the expiration notice retracted, DNR personnel observed other "activity [at the site] that could be associated with drilling, but did not observe the drill bit actually boring in the well or actual operation of the drill rig and systems in the act of drilling." The Commissioner noted that by April, White's "drill rig had been located to Kenai."

---

[41] "We review the agency's factual findings using the substantial evidence standard. 'Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support [the agency's] conclusion.' 'We determine only whether such evidence exists and do not choose between competing inferences or evaluate the strength of the evidence.'" *Alaskan Crude Corp. v. State, Alaska Oil & Gas Conservation Comm'n*, 309 P.3d 1249, 1254 (Alaska 2013) (quoting *Lopez v. Adm'r, Pub. Emps.' Ret. Sys.*, 20 P.3d 568, 570 (Alaska 2001) (alteration in original))).

[42] We note that paragraph 21 of the lease gave White "a period of one year after the termination, or any extension of that period as may be granted by the state, to remove from the leased area or portion of the leased area all machinery, equipment, tools, and materials."

The Commissioner found that "the 25 days lost [between the expiration notice and the lease reinstatement] were not critical to the overall capacity to drill on the site." The Commissioner did note, however, that White had a fairly small window of opportunity between reinstatement and thaw in order to remobilize, but he found that White made no productive use of this window, choosing to focus his efforts "on litigation rather than a resumption of activities." White testified that "following reinstatement he did take steps to assess the rental costs of trucking and other costs to move drilling equipment back to the site," as well as the availability of truck drivers for that purpose. But the Commissioner noted that White's decision to focus on litigation was a "strategic choice" that banked — ultimately unsuccessfully — on the courts accepting White's contract-interpretation arguments over DNR's. The Commissioner noted further that litigation activity is not a "drilling activity" as defined in the lease.

White does not dispute that he chose litigation over a resumption of drilling activities; he testified that after reinstatement of his lease he "did not perform any further work other than the preliminary mobilization process to re-mobilize and transport that equipment back out . . . ." We conclude that substantial evidence supports the Commissioner's decision that White did not continue drilling "with reasonable diligence" when he had the opportunity to do so, and that he therefore failed to satisfy the requirements for a continued lease extension under paragraph 4(c)(1).

## B.    There Is No Agency Decision on Damages For Us To Review.

White urges us to hold that the superior court should have remanded the case to the agency for a determination of his damages; he urges us to order such a remand. DNR asks us not to consider White's claim because his cross-appeal was

untimely[43] and he waived the issue of damages. Our holding that the initial breach was cured by the reinstatement letter moots any claim for damages following reinstatement. But the issue remains whether White is entitled to damages incurred between the January 2, 2009 expiration notice and the reinstatement 25 days later.[44]

However, there is no agency decision on damages for us to review. Oil and gas lessees are required, at least initially, "to pursue" "all grievances through administrative remedies."[45] When filing an appeal or request for reconsideration, the appellant must "specify the remedy requested."[46] In this case, at every step of the administrative appeal process White asked only that DNR reinstate the lease. He had repeated opportunities in the successive administrative proceedings to present evidence of his damages, or at least to assert a right to a separate hearing on the issue.[47] But

---

[43]     We conclude that the timing of White's pro se cross-appeal indicated a good-faith effort to comply with the appellate rules based on reasonable confusion about their requirements, and we therefore consider it. *See Conitz v. Alaska State Comm'n for Human Rights*, 325 P.3d 501, 506 (Alaska 2014).

[44]     *See* RESTATEMENT (SECOND) OF CONTRACTS § 236 cmt. b (AM. LAW INST. 1981) ("[E]very breach gives rise to a claim for damages.").

[45]     *White v. State, Dep't of Nat. Res.*, 14 P.3d 956, 960 (Alaska 2000) (citing 11 AAC 88.155); *Danco Expl., Inc. v. State, Dep't of Nat. Res.*, 924 P.2d 432, 434 (Alaska 1996) ("Oil and gas lessees and lease bidders which have grievances with the State must pursue the administrative procedures provided by 11 AAC 02.010, *et seq*.").

[46]     11 AAC 02.030(a)(10).

[47]     For example, in February 2009 the Commissioner, responding to White's request for reconsideration of the reinstatement letter, invited him to "submit additional written material or request a hearing," but White declined, stating "I do not believe that an additional briefing or hearing is necessary in order for you [to] decide this issue." At the first administrative hearing on the termination, White's counsel stated: "We do not

(continued...)

although White made references to "being damaged," experiencing "undue financial harm" and "escalating" costs, and losing opportunities to sell gas, he never specifically demanded money damages for these alleged harms.

It is up to DNR in the first instance to determine whether White has waived any right to recover damages. On the appellate record, however, we see no basis on which to conclude that he was deprived of a right to seek damages in the administrative proceeding or that the superior court erred when it failed to remand for further proceedings on that issue.

## V.    CONCLUSION

We REVERSE the superior court's decision reinstating the lease and AFFIRM the Commissioner's decision terminating the lease.

---

**47**    (...continued)
plan on putting any additional evidence on . . . ." At the second administrative hearing following the superior court's remand, White testified that he could prove the costs incurred in demobilizing the well site and the damages from lost opportunities to export gas, but he provided no evidence in support of the claim and waived the opportunity to file a post-hearing brief.