NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| LESLIE PAUL ZERBE,<br><br>          Appellant,<br><br>   v.<br><br>JOHN COLLETTE,<br><br>          Appellee. | Supreme Court No.: S-18166<br><br>Superior Court No.: 4FA-16-01836 CI<br><br>MEMORANDUM OPINION<br>AND JUDGMENT\*<br><br>No. 1955 – March 22, 2023 |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Thomas I. Temple, Judge.

Appearances: Leslie Zerbe, pro se, Fairbanks, Appellant. John Collette, pro se, Fairbanks, Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

1.     This appeal arises from the superior court's decision, after a bench trial, about a landlord-tenant dispute between Leslie Zerbe and John Collette. Zerbe leased an airplane hangar to Collette in which Collette planned to build modular units to be placed on other property and, unbeknownst to Zerbe, used as a marijuana cultivation

---

\*     Entered under Alaska Appellate Rule 214.

facility. The salient facts are set forth in the superior court's decision, which we attach as an appendix.[1]

2.　　We have considered Zerbe's assertions of error with respect to some of the superior court's findings of fact, but, given the evidence in the record supporting those findings, we do not see that any are clearly erroneous.[2] We also have considered Zerbe's assertions of error regarding interpretations of the parties' lease agreement, but we conclude that the superior court's interpretations were correct as a matter of law.[3]

3.　　Zerbe raised some issues on appeal that were not raised at trial, as follows.

(a)　　At trial Zerbe argued that Collette had exposed Zerbe to criminal liability under federal marijuana laws, allegedly breaching a paragraph of the lease requiring Collette to "comply with any and all laws." The superior court ruled that "Collette's act of building structures in the hangar that were to be used in a licensed marijuana cultivation business at another location did not violate the lease provision to comply with all laws."[4] At trial Zerbe sought to enforce the terms of the lease. His argument that Collette breached the contract in multiple ways must have been based on the premise that the contract was valid. But on appeal Zerbe argues that the lease was

---

[1]　　The decision has been edited to conform to our technical requirements.

[2]　　*See Fairbanks North Star Borough v. Tundra Tours, Inc.*, 719 P.2d 1020, 1025 (Alaska 1986) ("We will not reverse the trial court's factual findings . . . unless they are clearly erroneous.").

[3]　　*See State, Dep't of Nat. Res. v. Alaskan Crude Corp.*, 441 P.3d 393, 398 (Alaska 2018) ("Questions of contract interpretation generally raise questions of law that we review de novo." (quoting *Alaskan Crude Corp. v. State, Dep't of Nat. Res., Div. of Oil & Gas*, 261 P.3d 412, 419 (Alaska 2011))).

[4]　　In making this ruling the superior court determined that: (1) "Collette did not manufacture marijuana in the hangar"; (2) Collette did not violate a Fairbanks North Star Borough ordinance requiring notice and written permission from the property owner before using premises as a marijuana establishment; and (3) "Collette did not force . . . Zerbe to participate in a marijuana enterprise."

*void* for violations of federal marijuana laws, an argument diametrically opposed to his position at trial and in his pleadings. Zerbe forfeited this claim by not raising it at trial.[5]

(b)    Zerbe now asserts a claim for intentional infliction of emotional distress (IIED). Zerbe first included an IIED claim in a rejected filing to amend his pleadings, which was not properly refiled. The IIED claim not only is not closely related to Zerbe's evidence presentation and arguments in the superior court, it was not even mentioned at trial. And Zerbe's IIED claim would require proving new and controverted facts about the parties' conduct and emotional distress.[6] Zerbe forfeited this claim by not raising it at trial.[7]

(c)    Zerbe claims to have a "constitutional right to not be forced by naivety or duress into a contract whose very essence is a federal crime." Zerbe does not point to anything suggesting he raised this putative constitutional claim in the superior court and cites no legal authority for it. And in light of the superior court's correct rulings that nothing about the lease agreement implicated federal crimes, it seems irrelevant. But, in any event, we decline to explore this alleged constitutional right due to lack of adequate briefing.[8]

---

[5]    *See Triem v. Kake Tribal Corp.*, 513 P.3d 994, 998 (Alaska 2022) ("We generally 'will not consider an issue raised for the first time on appeal . . . .' " (quoting *State v. Nw. Constr., Inc.*, 741 P.2d 235, 239 (Alaska 1987))).

[6]    *Fyffe v. Wright*, 93 P.3d 444, 455 (Alaska 2004) ("[T]o recover for IIED a party must show: (1) extreme and outrageous conduct, (2) that is intentional or reckless, (3) and causes emotional distress (4) that is severe.").

[7]    *See, e.g.*, *Revels v. Mun. of Anchorage*, No. S-14373, 2013 WL 1859198, at *4-5 (Alaska May 1, 2013) (concluding IIED claim waived when not asserted in trial court).

[8]    *See Adamson v. Univ. of Alaska*, 819 P.2d 886, 889 n.3 (Alaska 1991) ("[W]here a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal.").

4.     Zerbe claims that his due process rights were violated by the superior court.  Zerbe asserts that the court allowed Collette to file an improper ex parte complaint and to provide Zerbe improper notice by mailing notice to the wrong address. Although Zerbe cites a federal statute and two cases,[9] the cited authorities do not appear to be on point and he does not explain how or why they are applicable to his legal argument.[10]  In any event, Collette's complaint was personally served on Zerbe, and, after addressing Zerbe's concerns about service of documents, the superior court declined to impose any sanctions on Collette.[11]  We see no abuse of discretion in the court's refusal to impose sanctions,[12] and we conclude that Zerbe had an adequate opportunity to defend himself against Collette's claims at trial so that his due process rights were not violated.

---

[9]     Zerbe cites *Simon v. Craft*, 182 U.S. 427 (1901) (holding that due process requires judicial proceedings provide "full notice and an opportunity to defend").  Zerbe also cites Justice Rutledge's concurrence in *Screws v. United States*, 325 U.S. 91, 129-30 (1945) (discussing expectation of state official's knowledge of individual's basic legal rights).  Finally, Zerbe cites 18 U.S.C. § 241 (making conspiracy against constitutional rights a federal crime).

[10]     *See Adamson*, 819 P.2d at 889 n.3.

[11]     The superior court found:  "Neither party appeared to have read or at least understood the Rules of Civil Procedure.  Both parties failed to competently and efficiently present their claims and defenses."  Considering that both parties were self-represented for most of the case, the superior court refused to hold Collette in contempt for mailing documents to the wrong address.

[12]     *See Enders v. Parker*, 125 P.3d 1027, 1037 (Alaska 2005) (emphasizing that trial court's decision whether to impose sanctions is "subject to review only for abuse of discretion" (quoting *Alaska Fed. Sav. & Loan Ass'n of Juneau v. Bernhardt*, 794 P.2d 579, 583 (Alaska 1990))).

5.      Zerbe raises one evidentiary issue on appeal.[13]  At trial Zerbe moved to admit a surreptitiously made audio recording, asking the superior court to relax the discovery rules under Alaska Civil Rule 94.[14]  The superior court denied Zerbe's motion. Zerbe characterizes the superior court's denial as an "ex-post facto order," but we interpret this as arguing that the superior court abused its discretion by denying admission of the audio recording.

The superior court made a highly detailed ruling denying Zerbe's motion. The court found:  "The defendant waited until plaintiff had testified completely, been cross-examined, committed himself to his case, his position, his evidence, and only then, after all that was done and over a year after discovery had been closed, did . . . the defendant say, oh, by the way, judge, we have a secret recording."  Zerbe claimed that "the audio was lost in 2016, and found in the winter of 2019."  Zerbe's agent similarly testified to making the recording in March 2016 and then recovering it from a damaged laptop in January 2020.  The court stated it did "not find it credible that this recording was just unable to be found . . . . [and] it was either not found due to the negligence or recklessness, or even potential intent of the parties, they did not want this produced until after . . . Collette testified in order to give themselves an advantage."  The court found that admitting the recording would be "unfair and overly prejudicial to [Collette's] case."  Because Zerbe withheld the existence of the recording and the court found potential prejudice to Collette, it was not an abuse of discretion to deny Zerbe's motion to admit the secret recording into evidence.

---

[13]     *See Bylers Alaska Wilderness Adventures, Inc. v. City of Kodiak*, 197 P.3d 199, 205 (Alaska 2008) ("The trial court's evidentiary rulings are . . . reviewed under the abuse of discretion standard.").

[14]     *See* Alaska R. Civ. P. 94 (providing that court may relax or dispense civil rules if strict adherence would manifest injustice).

6. Collette did not file a cross-appeal.[15] He nonetheless argues in his appellee brief that we should reverse the superior court's damages award and remand for inclusion of additional damages. But "when an appellee 'attack[s] [a] decree [or judgment] with a view either [of] enlarging his own rights thereunder or of lessening the rights of his adversary' [then] the appellee must file a cross-appeal."[16] Thus once a party has filed a timely notice of appeal, the other party must file its notice of appeal or the party "waives the right to contest rulings below."[17] We therefore decline to consider the merits of Collette's argument about the superior court's damages award.

7. We do, however, address one argument Collette raises in his brief. The superior court found that Collette succeeded in proving Zerbe committed a tort by damaging Collette's modular units. But the court also found that Collette failed to prove the amount of damages as a separate factual issue. In its ruling the court relied on a partial settlement agreement reached earlier by the parties. Collette argues that the court improperly accessed the settlement agreement and that he is entitled to damages for the cost of repairing his buildings.

Collette misunderstands the relevant law. Alaska Civil Rule 100(g) provides that mediation *proceedings* are confidential. But in this matter, after a confidential mediation an agreement was placed on the record by a district court judge

---

[15] *See Andrew B. v. Abbie B.*, 494 P.3d 522, 537 (Alaska 2021) ("Under Alaska Appellate Rule 204(a)(2), once a party has filed a timely notice of appeal, any other party may cross-appeal within 14 days. We have consistently held that an appellee's failure to cross-appeal in a timely manner waives the right to contest rulings by the trial court.").

[16] *Nicolos v. North Slope Borough*, 424 P.3d 318, 325 (Alaska 2018) (first three alterations in original) (quoting *El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 479 (1999)).

[17] *Peterson v. Ek*, 93 P.3d 458, 467 (Alaska 2004) (holding appellee waived three claims of error raised in brief, that trial court: (1) incorrectly awarded recovery in quantum meruit; (2) forgot to credit certain damages; and (3) awarded too low damages for trespass to chattels).

with both Zerbe and Collette agreeing to be bound by its terms. The agreement required Zerbe to give the buildings to Collette, who would provide Zerbe a third-party estimate for water damage, and the parties would split the cost evenly. The superior court determined that Collette had waived his right to damages for water damage to the buildings by not following the terms of the settlement agreement. The merits of the court's ruling are not properly before us and we decline to consider them, but we emphasize that the court did not, as Collette argues, act improperly by taking the settlement agreement into account: The agreement reached by the parties at the mediation, and placed on the record, is not itself confidential under Rule 100(g).

8.    In conclusion, we AFFIRM the superior court's decision.

| | | |
|---|---|---|
| JOHN COLLETTE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Superior Court No.: 4FA-16-01836 CI |
| v. | ) | |
| | ) | |
| LESLIE PAUL ZERBE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DECISION AFTER TRIAL**
**Findings of Fact and Conclusions of Law**

Leslie Zerbe is a pilot who owned a hangar in Fairbanks, Alaska. Zerbe decided to sell the hangar, so he listed it for sale. In the fall of 2015, John Collette saw that the hangar was for sale and approached Zerbe at the hangar to see if he could rent the hangar. Collette wanted to build a building during the winter of 2015/2016. By renting the hangar, Collette could construct his building indoors, unhindered by the winter weather. Collette planned to complete his building and move it to another location in the spring of 2016. In order to be able to relocate his building, Collette planned to construct the building in two sections, i.e., a modular building ("the buildings").

Collette told Zerbe that he intended to build two cabins in the hangar. In reality, Collette intended to build a structure that would be used to grow marijuana. Unbeknownst to Zerbe, Collette was seeking licensure for a limited marijuana grow operation under recently enacted state laws legalizing such an operation.

Having plans to spend the winter in Costa Rica, Zerbe thought it would be good to have a tenant in his hangar. This scenario would not only provide a little

income to Zerbe, but would also provide someone to keep an eye on his property, keep the snow brushed off of his airplane that was parked outside, and keep the heat running during the winter. Accordingly, Zerbe agreed to lease the hangar and surrounding property ("the premises") to Collette.

Zerbe drafted a written lease agreement ("the proposed lease") and provided a copy to Collette for his review. The proposed lease consisted of three sheets of paper titled "Commercial Lease Agreement Release." The first two sheets were typewritten on the front and back and numbered pages 1-4. The third sheet was a signature page numbered page 5. Collette reviewed the proposed lease carefully over a few days.

Unbeknownst to Collette, Zerbe had recently entered into a written property use agreement ("DesJarlais contract") with Clinton DesJarlais, an agent/employee/friend of Zerbe.[1] The DesJarlais contract covered the period of August 1, 2015, through August 1, 2016. The DesJarlais contract provided that "DesJarlais and his family may utilize the hangar and open land as he so desires."[2] The DesJarlais contract allowed DesJarlais and his family to use the premises for all lawful business and private purposes, provided that they "accommodate[*] any tenants that may or may not be renting on the premises currently or in the future . . ."[3]

On September 11, 2015, Zerbe and Collette ("the parties") met at a Fairbanks coffee shop to sign the lease. When Collette arrived, Zerbe was hastily writing on the back of the signature page of the proposed lease, which is also numbered page 5. Zerbe explained that he was handwriting the additional page to clarify some provisions.

---

[1]    *See* Plaintiff's Exhibit 5.

[2]    *Id.*

[3]    *Id.*

When Zerbe finished writing he handed the proposed lease, including the newly added handwritten page, to Collette. The proposed lease had also been modified in other ways. Specifically, it now included duplicate (and almost identical) pages 1 and 2 — that is two sheets of paper with writing on the front of each (page 1) and on the back of each (page 2). The difference between the duplicate pages is that on the first page 1 the term of the lease was changed from 8 to 9 months, and the commencement date was changed from October 1, 2015, to October 15, 2015.[4] On the second page 1, the handwritten word "waived" was added over paragraph 4, which originally proposed to require the tenant to pay a $1,000 security deposit.[5]

Neither party discussed the newly added or amended provisions of the proposed lease. Collette scanned the handwritten page, but did not read it thoroughly. The parties then signed the signature page, which was on the reverse side of the handwritten page, turning the proposed lease into an actual lease agreement ("the lease").[6] Since Collette did not have a copy of the handwritten page, Zerbe offered to go with Collette to a photocopying business so that Collette could make a copy of the lease, but he declined. Consequently, Collette did not actually receive a copy of

---

[4] The term of the lease was from October 15, 2015, to June 15, 2016, which equals eight months. Neither party established why the "8" months was changed to "9" months.

[5] Neither party claimed that Collette paid or was required to pay a security deposit. The court finds that, by signing the lease that included the added word "waived" above paragraph 4 on the second page 1, the parties agreed in writing to not require a security deposit.

[6] The handwritten page was sometimes referred to as the "lease addendum" at trial in order to distinguish the handwritten page from the typewritten pages of the lease. This handwritten page was not a lease addendum; rather, it was part of the lease that the parties entered into.

the lease, which now included the handwritten page, until sometime after the litigation in this case commenced.[7]   Additionally, Zerbe neither informed Collette of the existence of the DesJarlais contract, nor was a copy provided to Collette until sometime after the litigation in this case commenced.

The lease includes the following pertinent provisions on pages 1-4:[8]

1.  **TERM:**   This lease shall be for a term of 9 months, commencing October 15, 2015.  **Lease shall extend from October 15, 2015 to June 15, 2016.**

2.  **RENT**:  Tenant shall pay Landlord rent in monthly payments of **$1000** on the first (1st) day of each month in advance, to include weekends and holidays, to Les or Jane Zerbe by deposit in Landlords' account at Denali State Bank.

    [* * *]

4.  **SECURITY DEPOSIT.** *Tenant shall pay a security deposit of $1000 to be returned upon termination of this Lease and the payment of all rents due and less any set off for damages to the Premises. Security deposit shall be returned within thirty (30) days provided there are no damages in excess of normal wear and tear to premises.*

5.  **USE OF PREMISES**. The Premises shall be used and occupied by agents for and employees of John Collette. This property is outside the city limits of Fairbanks and is zoned as heavy industrial area; therefore, any type business may be conducted on this property.  Tenant shall comply with any and all laws, ordinances, rules and orders of any and all governmental or quasi-governmental authorities affecting the cleanliness, use, occupancy and preservation of the Premises and property.

6.  **CONDITION OF PREMISES**. Having received the pre-move in inspection page, Tenant stipulates, represents and warrants that Tenant

---

[7]   The original lease was admitted at trial as Defendant's Exhibit P.

[8]   Format and style of text, e.g., grammatical errors, unusual use of capital letters, italicization, etc., is set forth as in original.

has examined the Premises, and that they are at the time of this Lease in good order, repair, and in a safe, clean and tenantable condition.

7.    **ASSIGNMENT AND SUB-LETTING**.  Tenant shall not assign this Agreement, or sub-let or grant any license to use the Premises or any part thereof without the prior written consent of Landlord.

8.    **ALTERATIONS AND IMPROVEMENTS**.  Tenant shall make no alterations to the buildings or improvements on the Premises or construct any building or make any other improvements on the Premises without the prior written consent of Landlord.  Any and all alterations, changes, and/or improvements built, constructed or placed on the Premises by Tenant shall, unless otherwise provided by written agreement between Landlord and Tenant, be and become the property of Landlord and remain on the Premises at the expiration or earlier termination of this Agreement.

[* * *]

11.    **UTILITIES & SERVICES:**  At this time hangar does not have water or septic available, but both are available at the house on the property. Tenants shall at their own expense provide the following utilities or services:

[* * *]

b.    **Garbage disposal.  Trash** — Tenants shall themselves dispose of garbage, transporting to public transfer station.  Tenant shall not allow trash to accumulate outside the residence, and any of Tenants' possessions outside the premises shall be arranged in a neat and orderly fashion. Tenant agrees to promptly remove and dispose of trash to the transfer station so as to keep the property free of trash.  In the event that Landlord had to remove Tenant's trash, **fee will be billed at $50 per occurrence**.

12.    **MAINTENANCE AND REPAIR; RULES.**  Tenant will, at its sole expense, keep and maintain the Premises and appurtenances in good and clean condition and repair during the term of this Agreement and any renewal thereof.  Without limiting the generality of the foregoing, Tenant shall:

[* * *]

c.    Not obstruct the windows or doors;

1. **Tenant shall replace and/or repair all light fixtures to tenants liking at no expense to the landlord, same with air compressor.**

[* * *]

14. **INSPECTION OF PREMISES.** Landlord and Landlord's agents shall have the right at all reasonable times during the term of this Agreement and any renewal thereof to enter the Premises for the purpose of inspecting the Premises and all buildings and improvements thereon. And for the purposes of making any repairs, additions or alterations as may be deemed appropriate by Landlord for the preservation of the Premises or the building. Landlord and its agents shall further have the right to exhibit the Premises and to display the usual "for sale", "for rent" or "vacancy" signs on the Premises at any time within forty-five (45) days before the expiration of this Lease. The right of entry shall likewise exist for the purpose of removing placards, signs, fixtures, alterations or additions, but do not conform to this Agreement or to any restrictions, rules or regulations affecting the Premises.

[* * *]

17. **INDEMNIFICATION.** Landlord shall not be liable for any damage or injury of or to the Tenant, Tenant's family, guests, invitees, agents or employees or to any person entering the Premises or the building of which the Premises are a part or to goods or equipment, or in the structure or equipment of the structure of which the Premises are a part, and Tenant hereby agrees to indemnify, defend and hold Landlord harmless from any and all claims or assertions of every kind and nature.

18. **DEFAULT.** If Tenant fails to comply with any of the material provisions of this Agreement, other than the covenant to pay rent, or of any present rules and regulations or any that may be hereafter prescribed by Landlord, or materially fails to comply with any duties imposed on Tenant by statute, within seven (7) days after delivery of written notice by Landlord specifying the non-compliance and indicating the intention of Landlord to terminate the Lease by reason thereof, Landlord may terminate this Agreement. If Tenant fails to pay rent when due and the default continues for seven (7) days thereafter, Landlord may, at Landlord's option, declare the entire balance of rent payable hereunder to be immediately due and payable and may exercise any and all rights and remedies available to

Landlord at law or in equity or may immediately terminate this Agreement.

19. **ABANDONMENT.** **If** at any time during the term of this Agreement Tenant abandons the Premises or any part thereof, Landlord may, at Landlord's option, obtain possession of the Premises in the manner provided by law, and without becoming liable to Tenant for damages or for any payment of any kind whatever. Landlord may, at Landlord's discretion, as agent for Tenant, relet the Premises, or any part thereof, for the whole or any part thereof, for the whole or any part of the then unexpired term, and may receive and collect all rent payable by virtue of such reletting, and, at Landlord's option, hold Tenant liable for any difference between the rent that would have been payable under this Agreement during the balance of the unexpired term, if this Agreement had continued in force, and the net rent for such period realized by Landlord by means of such reletting. If Landlord's right of reentry is exercised following abandonment of the Premises by Tenant, then Landlord shall consider any personal property belonging to Tenant and left on the Premises to also have been abandoned, in which case Landlord may dispose of all such personal property in any manner Landlord shall deem proper and Landlord is hereby relieved of all liability for doing so.

20. **ATTORNEYS' FEES.** Should it become necessary for Landlord to employ an attorney to enforce any of the conditions or covenants hereof, including the collection of rentals or gaining possession of the Premises, Tenant agrees to pay all expenses so incurred, including a reasonable attorneys' fee.

[* * *]

24. **MODIFICATION.** The parties hereby agree that this document contains the entire agreement between the parties and this Agreement shall not be modified, changed, altered or amended in any way except through a written amendment signed by all of the parties hereto.

[* * *]

27. **Tenant further agrees to not give any spare keys to employees or loan a key for any period of time. Tenant may use all waste oil that is presently on the premises. Tenant shall keep in good working order**

**all lights and the waste burner and shall be responsible to pay for such upkeep.**

28. **Tenant is responsible for all snow removal and physical damage to the physical premises. Tenant agrees to sweep all snow with the accumulation of 5 inches or more on any aircraft Les Zerbe keeps on the premises. Tenant agrees to allow Clinton DesJarlais to live in hanger [sic] until end of November so as to work on the apartment.**

The lease also includes the following pertinent provisions on handwritten page 5:[9]

(l.) Deposit $1,000.00 by 15th of each Month starting Oct. 15, 2015 through June 15, 2016 for $9,000.00 total rent payment over this time period. Further rental contract or purchase agreement can go forward for discussion at this time.

\* \* \*

(4.) Tenant agrees to let Clinton Dej. remain on premises and in the hangar until improvements are finished.

\* \* \*

(6.) No modifications or repairs shall be Made to Hangar without Landlords prior permission.

(7.) Bobcat rental is $50.00 per hour, and shall be left in th [sic] hangar. No cold starts.

The parties met at the hangar on or about October 15, 2015, and a key to the hangar was provided to Collette. Collette took possession of the premises. At that time the hangar was clean and in good condition, as provided in paragraph 6. The parties did not discuss the Bobcat and it was not present inside the hangar when

---

**9** Format and style of text, e.g., grammatical errors, unusual use of capital letters, etc., is set forth as in original.

Collette took possession of the premises.[10] Neither Collette nor his employees ever touched or used the Bobcat. It was never in the hangar during Collette's tenancy.

Zerbe intended to build an apartment in the southeast corner of the hangar. Zerbe hired DesJarlais to complete this project. Some of the apartment project was completed prior to Collette's tenancy. Specifically, walls were framed in the southeast corner. A ceiling/floor was placed over the framed walls, thus creating a second story over the apartment. Plans were also made to install a garage door near the apartment and to install plumbing. Paragraph 28 and handwritten paragraph 4 allowed for DesJarlais to have access to the hangar until the apartment project was finished. DesJarlais, however, completed little, if any, work inside the hangar after Collette's tenancy began. It reasonably appeared to Collette and his crew that no work was being done inside the hangar on the apartment project. Before the end of October 2015, Collette moved DesJarlais' personal property and building materials into the framed apartment, thus clearing more floor space for Collette's project.[11]

Once the floor space was cleared, Collette began simultaneously constructing the buildings. Each section was approximately 12 feet wide by 40 feet long. The buildings were built parallel to each other with approximately three feet

---

[10] The language in handwritten paragraph 7 that provides that the Bobcat "shall be left in [the] hangar" implies that the Bobcat would be in the hangar at the time Zerbe turned the premises over to Collette, but it was not. It is not clear where the Bobcat was located at all times during Collette's tenancy. Conflicting evidence was presented that the Bobcat was used by DesJarlais to remove snow at Zerbe's duplex, that the Bobcat had an oil leak and was off site being repaired, that the Bobcat was never on the premises during Collette's tenancy until April 2016, when it was first seen by Collette, and that the Bobcat remained parked outside of the hangar.

[11] DesJarlais left Fairbanks before his belongings were placed into the framed apartment and did not return until March 2016.

of space in between the length of the buildings. Thus, the floor space used for the buildings was approximately 1,080 square feet. The parties knew that the hangar door opened to a height of ten feet, so the buildings would have to be built to no more than ten feet tall in order for the buildings to be removed from the hangar.

During his tenancy, Collette allowed his brother and employee [. . .] to park a vehicle in the hangar, in the area of the apartment project. He planned to work on the vehicle during his free time, while constructing the buildings. The vehicle was blocked in the hangar by the buildings and could not be removed from the hangar without first removing one of the buildings.

The lease continued without incident until March 2016. At this time, DesJarlais returned to Fairbanks with his family. He arrived at the hangar late at night and, finding the framed apartment full of his belongings, and no room to complete the apartment project, called Zerbe in Costa Rica. Zerbe returned to Fairbanks to assess the situation.

As had DesJarlais, Zerbe took umbrage over what he observed in the hangar. Specifically, Zerbe was displeased to see [the employee's] vehicle in the hangar and to see that both buildings were being built simultaneously, thus taking up much of the hangar's floor space. Zerbe had incorrectly assumed that only one building would be built at a time, thus leaving ample floor space for the apartment project. With both buildings in the hangar, along with [the employee's] vehicle, there was not enough room for DesJarlais to resume the apartment project he had ignored for over four months.

Zerbe also believed that the buildings were too tall to fit through the hangar door without causing possible damage to the hangar door. Collette did not share Zerbe's concerns about being able to remove the buildings, since he constructed them to be able to fit through the ten-foot-high hangar door upon completion. The buildings likely looked too tall to Zerbe because they were sitting on six-inch foam blocks and had boards attached to the roof. The boards, however, were not a permanent part of the

buildings; rather, they were used to assist in holding the walls and ceiling beams straight during the construction. With the temporary boards and foam blocks removed, the buildings would have fit through the hangar door.[12]

Nevertheless, in order to appease Zerbe, Collette researched the possibility of removing the hangar door in order to create additional height for the removal of the buildings. Collette learned that the standard industry practice for removing a hangar door was to make two holes (a/k/a "pick pockets") in the door and then use a forklift to remove the door. This would allow the door to be removed without causing damage, other than some cosmetic damage which could be patched upon reattaching the hangar door. Collette offered to pay Zerbe a bond of $8,000 in case the door removal resulted in any damage.[13]

On March 7, 2016, Zerbe gave Collette a letter in an attempt "to resolve the current rental agreement issues" the parties had.[14] Zerbe asserted that Collette had breached the lease by "using the entire hangar instead of half as was agreed to."[15] Zerbe offered to allow Collette to pay no further rent in exchange for being out of the hangar by April 15, 2016, without removing the hangar door. Zerbe was adamant that he did not want the hangar door removed. Zerbe added that his offer

---

[12]     The court notes that when Zerbe and his crew removed the buildings, the removal was done without damage and without the need to remove the hangar door. The court finds that, had he been given the opportunity, Collette could have accomplished the same damage-free removal.

[13]     Zerbe subsequently obtained an estimate from Overhead Door Co. of Fairbanks to remove and re-install the hangar door for $12,610. *See* Defendant's Exhibit R. The estimate stated that the door would be removed after creating pick pockets and then patching the holes upon reinstallation.

[14]     *See* Plaintiff's Exhibit 6. This letter was sometimes referred to as the "first eviction notice" at trial, but it is not an eviction notice.

[15]     *Id.*

required Collette to "cease construction except to prepare for the removal of the [buildings]."[16]

Collette did not respond to Zerbe's offer and continued to construct the buildings. Three days later, on March 10, 2016, Zerbe served Collette a document titled "Notice to Tenant of Termination of Tenancy for Violation of Agreement/Law" (hereinafter, "the notice").[17] The notice claimed that Collette had "seriously violated [the] rental agreement" and cited to paragraph 8 of the lease, which prohibited the tenant from constructing any building on the premises.[18] The notice gave Collette 10 days to vacate the premises and reminded Collette that no hangar door removal would be allowed.[19] The notice also stated that Zerbe was "rescinding any offer you have made about bonding the hangar door" citing a lack of timely communication.[20]

Collette ignored the notice and continued to construct the buildings and pay the required rent. Collette considered the claimed violation – that he was constructing the buildings in the hangar – to be a bad faith attempt by Zerbe to evict him. The parties were aware that the premises were leased for the express purposes of having an enclosed space to construct the buildings. Collette was also aware that Zerbe was in a hurry to sell the premises and believed this was the real motivation behind the notice, and what Collette viewed as an unlawful eviction attempt.

---

[16] *Id.*

[17] *See* Plaintiff's Exhibit 10. The notice was sometimes referred to as the "second eviction notice" at trial, but it was actually the first eviction notice.

[18] *Id.*

[19] *Id.*

[20] *Id.*

On March 30, 2016, Zerbe served Collette a document titled "Violation of Agreement Notice and Opportunity to Correct" (hereinafter, "the final notice").[21] In the final notice, Zerbe listed several ways he believed Collette violated the lease. Specifically, Collette was accused of violating the lease by: (1) changing the locks to the hangar man door; (2) occupying more than half the hangar floor space; (3) denying DesJarlais and his family "unfettered access" to the hangar; and (4) moving DesJarlais' property throughout the hangar without his consent. Zerbe acknowledged that the hangar floor space agreement was not written in the lease, but claimed the parties had made an oral agreement on this provision.

In addition to listing alleged violations, Zerbe listed ways that Collette could correct the "contractual deficiencies." These were: (1) moving the eastern side building out of the hangar (with Zerbe or DesJarlais lifting the hangar door) and off Zerbe's property; and (2) moving [the employee's] vehicle out of the back of the hangar. Zerbe reiterated his claim that only one building was allowed to be built at a time and that Collette cannot get around this alleged oral provision by connecting the buildings with a wooden ramp. Finally, Zerbe threatened that failure to remedy the perceived deficiencies within 10 days of receipt of the final notice would result in termination of Collette's tenancy and noted that Collette's property and buildings may be seized.

Disagreeing that he had breached the lease in any material way, but believing that Zerbe was determined to not allow the lease to continue until June 15, 2016, as agreed, Collette began making arrangements to remove his unfinished buildings. Specifically, Collette began clearing a parcel of land for the buildings. Zerbe and his agent, DesJarlais, however, soon located the parcel that was being

---

[21]    *See* Plaintiff's Exhibit 11. The final notice was sometimes referred to as the "third eviction notice" at trial, but it was actually the second (and last) eviction notice.

cleared and made a report to the Department of Transportation (DOT) that the parcel did not have proper ingress and egress to the highway, i.e., that the driveway had not been approved. Upon learning from DOT that the driveway being constructed would not be permitted, Collette shut down the land-clearing project and began looking for an alternate location for the buildings. Collette located a suitable property and reached an agreement to purchase the property.

On April 25, 2016, Zerbe removed Collette's buildings from the hangar and locked Collette out. Zerbe parked the buildings on one of his adjacent parcels and blocked the buildings so that Collette could not remove them. Zerbe purchased a roll of plastic sheeting in order to cover the unfinished buildings so that they might be protected from rain, but did not cover the buildings. Upon learning that his buildings had been removed from the hangar, Collette went to the premises to inspect the buildings. Collette was surprised that the buildings appeared to have suffered no damage while being removed and [dragged] to their current location. Collette used the roll of plastic sheeting, which Zerbe had left outside of the hangar, to cover the buildings.

Zerbe wrote his name on the buildings and issued a trespass notice to Collette, thus refusing to allow Collette to retrieve his buildings. Zerbe claimed the law allowed him to "distrain" the buildings because he was owed back rent. Specifically, Zerbe claimed that he should have been paid double the rent that was stated in the lease since Collette used double the floor space of the hangar to build both buildings simultaneously, rather than one at a time. Collette initiated litigation in order to recover his buildings.

At a settlement conference held on August 10, 2016, the parties agreed that: (1) Collette would be allowed to retrieve his buildings; (2) Collette would have [. . .] the buildings [inspected] for water damage and [obtain] an estimate to repair any water damage that was discovered; and (3) Zerbe would pay Collette half of the amount required to repair the water damage. Although Collette retrieved his

buildings, he never provided an estimate to Zerbe that established the presence of any water damage or an amount required to repair such damage.

This matter proceeded to trial on August 5-9, 2019, December 14-18, 2020, and December 21, 2020. Both parties represented themselves at trial.

## Collette's Claims

Collette alleges that Zerbe breached the lease and/or committed torts in the following ways:

1. By unilaterally evicting Collette.

2. By removing the buildings from the hangar without notice or formal eviction proceedings and substantially damaging the buildings.

3. By trespassing.

4. By causing Collette lost time and future rent.

5. By demanding higher rent than called for in the lease.

6. By advertising the hangar for sale before the contract allowed and disrupting the building process.

7. By claiming the buildings as his own property and attempting to sell them.

8. By threatening to forcibly dismantle the buildings.

9. By surveilling and intimidating Collette and his employees, slowing down the process of constructing and relocating his buildings.

10. By placing Collette's whole marijuana enterprise in jeopardy with the early eviction.

11. By entering into the lease agreement in bad faith because he did not intend to go through with the provisions.

12. By failing to secure the hangar and thereby putting Collette's belongings at risk.

Collette also claims that he is entitled to punitive damages.

*Zerbe breached the lease by terminating the lease and evicting Collette.*

Collette asserts that Zerbe breached the lease by unilaterally evicting him. The term of the lease was from October 15, 2015, through June 15, 2016. Paragraph 1 on handwritten page 5 provided that rent of $1,000 per month was due by the 15th of each month beginning on October 15, 2015, through June 15, 2016. The court finds that Collette timely paid all rent required by the lease, including the rent due by April 15, 2016, which covered the period through May 14, 2016. Zerbe unilaterally evicted Collette on April 25, 2016, before the term of the lease expired. Zerbe accomplished the eviction by forcibly removing Collette's property from the hangar, locking the hangar, and issuing a trespass notice to Collette.

At trial, Zerbe testified that Collette threatened to remain in the hangar past the expiration of the lease and tie Zerbe's hangar up in court. Zerbe further testified that in response he decided to preemptively evict Collette from the premises. Zerbe claimed that this would allow him to litigate from the preferable position of having possession of the hangar, rather than the less desirable position of litigating while trying to gain possession of the hangar.

Collette denied both threatening to remain in the hangar past the expiration of the lease and threatening to tie up the hangar in court. The court finds Collette's testimony more credible than any other testimony on this issue. Collette wanted to get his buildings out of the hangar and relocated as soon as possible in order to begin growing marijuana for profit. Collette did not want to remain in the hangar or on the premises past June 15, 2016.

Zerbe breached the lease by evicting Collette before the term of the lease expired. As will be discussed in more detail when Zerbe's claims are considered below, Zerbe did not have just cause to evict Collette. Accordingly, Collette is entitled to reimbursement of twenty days rent (April 25, 2016 – May 14, 2016). At the rate of $1,000/month this comes to $666.67. **Collette is thus awarded $666.67.**

*Zerbe breached the lease by removing the buildings from the hangar and committed a tort by damaging the buildings.*

As discussed above, Zerbe breached the lease by evicting Collette without just cause. Removing the buildings from the hangar was part of the eviction, along with locking the hangar, and issuing a no trespass notice to Collette.

Although the buildings were not damaged by Zerbe during the original removal, they were subsequently damaged by Zerbe when he again moved the buildings to another location on his property. The damages caused by Zerbe consist of structural damage to the foundation and walls. Some of these damages are visible in Plaintiff's Exhibits 28, 29, 30, and 33. Some of the damages are alleged to include water damage caused by either rainfall or by Zerbe's act of placing the buildings directly on wet, muddy ground.

Zerbe asserts that any water damage was caused by Collette's act of improperly covering the buildings with the plastic sheeting that Zerbe acquired for the purpose of covering the buildings. Zerbe further asserts that, had Collette not taken Zerbe's plastic sheeting and covered the buildings, Zerbe would have used the sheeting himself and done a more thorough job that would not have led to water damage.

The court need not resolve the controversy of whether the buildings sustained water damage or who may be responsible for any such damage. This is because the parties agreed at a settlement conference that Collette would have the buildings inspected for water damage and obtain an estimate to repair any water damage that was discovered. The parties also agreed that Zerbe would pay Collette half of the amount required to repair the water damage. Collette did not present any evidence that he had the buildings inspected for water damage. Additionally, Collette never provided an estimate to Zerbe that established the presence of any water damage or an amount required to repair such damage. Thus, Collette has waived his claim to recover for water damage to the buildings.

The buildings suffered other damages, however. These damages include broken foundation boards and damaged sheetrock.[22] These damages were not caused by water; rather, they were caused by Zerbe's negligence when he moved the buildings the second time. Accordingly, Collette is entitled to monetary damages for the damage to the buildings.

Collette, however, failed to establish the amount of damages done to his buildings. Although Collette proved that Zerbe damaged his buildings, he produced no evidence to establish the *amount* of damages. It was Collette's burden to not only prove that Zerbe damaged his buildings, but the amount of damages as well. Collette failed to meet his burden. Nevertheless, Collette is entitled to nominal damages.

Nominal damages do not need to be specifically requested because a request can be "gleaned from [the] pleadings."[23] As far as amount, nominal damages are "usually one cent or one dollar."[24] Nominal damages of two dollars have been affirmed as well.[25] Additionally, nominal damages "are a sufficient basis for an award of punitive damages."[26] "Courts use the term 'nominal damages' to describe

---

[22]     *See* Plaintiff's Exhibits 28-30.

[23]     *Anchorage Chrysler Ctr., Inc. v. DaimlerChrysler Motors Corp.*, 221 P.3d 977, 990 (Alaska 2009) (alteration in original) (quoting *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985)) (allowing nominal damages though first requested on appeal because complaint raised claims and requested unspecified damages and additional relief).

[24]     *Zok v. State*, 903 P.2d 574, 578-79 (Alaska 1995).

[25]     *Gov't Emp.'s Ins. Co. v. Gonzalez*, 403 P.3d 1153, 1168 (Alaska 2017) (holding that superior court did not abuse discretion in supporting jury's $2 award).

[26]     *Zok*, 903 P.2d at 579 n.6; *Haskins v. Shelden,* 558 P.2d 487, 493 (Alaska 1976) ("[I]f a cause of action is found to exist by the jury, in a case where 'actual' damage is not an essential element of the cause of action, then, if the necessary culpability on defendant's part be established, a verdict for exemplary

two types of awards: (1) a 'trifling or token allowance' for a technical invasion of a plaintiff's rights or a breach of a legal duty when no actual injury is shown, or (2) 'the very different allowance' made when actual loss or injury is shown, but plaintiff has failed to prove the extent and amount of damages."[27] For the reasons detailed above, the second instance fits here.[28]

Because Collette proved that Zerbe damaged his buildings, Collette is entitled to an award of monetary damages. Because Collette failed to prove the amount of damages done to his buildings, he is limited to an award of nominal damages. **Accordingly, Collette is awarded nominal damages of $1.**[29]

*Zerbe breached the lease and committed a tort by trespassing.*

As discussed above, Zerbe breached the lease by evicting Collette without just cause. Removing the buildings from the hangar was part of the eviction. In order to remove the buildings, Zerbe had to first trespass into the hangar. Though Zerbe owned the hangar, by entering and taking the buildings, Zerbe interfered with Collette's possessory interest in the hangar and the buildings. The court finds this act of trespass was a breach of the lease, as well as a tort.[30]

---

damages is proper, though the award of other damages is nominal or absent entirely." (quoting MCCORMICK, *Damages* § 83 (West 1953))).

[27] *Zok*, 903 P.2d at 578 (quoting 1 Marilyn Minzer et al., *Damages in Tort Actions* § 2.[10], at 2-[18] (1993)).

[28] *See Anchorage Chrysler*, 221 P.3d at 992 (awarding appellants nominal damages after they alleged they were fraudulently induced to change their logos, and thus incurred damages in the cost of changing logos, but failed to prove an exact monetary loss).

[29] Punitive damages will be discussed below.

[30] *See Thrift Shop, Inc. v. Alaska Mut. Sav. Bank*, 398 P.2d 657, 660 (Alaska 1965) ("By unlawfully taking possession of appellee's property, appellants committed a tort and were liable as trespassers to appellee."). That Zerbe's taking

Collette has failed to establish how Zerbe's act of trespass, independent from the eviction, caused any damages. Thus, Collette is only entitled to recover nominal damages for Zerbe's act of trespass. **Collette is awarded nominal damages of $1.**[31]

*Zerbe did not breach the lease or commit a tort by causing Collette either lost time or future rent.*

Collette claims that Zerbe breached the lease and committed a tort by causing him lost time and future rent. Because Zerbe evicted Collette without just cause, Zerbe might be responsible for any rent that Collette was required to pay to another landlord from April 25, 2016 (the day of the eviction) until June 15, 2016 (the day the lease was to expire). No credible evidence was presented, however, that Collette actually paid any rent during this period. Neither did Collette prove by a preponderance of the evidence that he "lost time." More importantly, even if Zerbe did cause Collette "lost time," Collette failed to present any credible evidence of what the monetary value of any lost time amounted to; i.e., damages. Accordingly, Collette has failed to prove by a preponderance of evidence that he either "lost time" or had to pay "future rent."

*Zerbe did not breach the lease or commit a tort by demanding higher rent than called for in the lease.*

Collette claims that Zerbe breached the lease and committed a tort by demanding higher rent than was called for in the lease. As is discussed more fully below when Zerbe's claims are considered, Zerbe asserts that the lease was for only about half of the hangar's available floor space. It is undisputed that Collette used all of the hangar's available floor space, which was essentially the entire hangar, except for the southeast corner of the hangar where the apartment was being

---

of the buildings was wrongful is discussed more fully in the section on Zerbe's distraint claim below.

[31] Punitive damages will be discussed below.

constructed. Zerbe asserts that since Collette used double the floor space, he was entitled to collect double the $1,000 monthly rent provided for in the lease. Zerbe based the eviction and seizure of the buildings, in large part, on his belief that he was entitled to an additional $1,000 per month from Collette.

Paragraph 5 provides that "[t]he [p]remises shall be used and occupied by agents for and employees of <u>John Collette</u>." The premises include the hangar. Nowhere does the lease mention that Collette's use and occupancy of the hangar is limited to half of the hangar's floor space or a certain footprint.

As is discussed more fully below, the lease was a fully integrated contract. Any amendment to the lease provisions had to be agreed to in writing. Both parties concede that there is no signed written agreement that modifies, changes, alters, or amends Collette's use of the full available space of the hangar. Additionally, no credible evidence was presented that established that there was an oral agreement to limit Collette's use of the hangar to only half of the available floor space.

Thus, Zerbe was only entitled to collect $1,000 rent per month as provided for in the lease. Zerbe had no legal right to demand that Collette pay double the rent provided for in the lease. It is also not clear to the court whether Zerbe actually demanded the extra $1,000 rent per month before the eviction, or in subsequent negotiations regarding the seized buildings. Even if such a demand had been made before the eviction, the demand itself would neither be a breach of the lease nor a tort. Collette refused to meet the demand and has not established that the demand caused him any damages. Accordingly, Collette has failed to prove this claim.

*Collette failed to establish that Zerbe breached the lease or committed a tort by either advertising the hangar for sale before the contract allowed, or by disrupting the building process.*

Collette claims that Zerbe breached the lease or committed a tort by advertising the hangar for sale before the lease expired. It is undisputed that the

premises, including the hangar, were listed for sale when the parties negotiated the lease. It was further understood by the parties that Zerbe intended to prepare the premises for sale and to eventually list the premises for sale, in the hopes that a sale could close upon expiration of the lease. Indeed, the purpose for the apartment project in the southeast corner of the hangar was to increase the sale value of the premises and to make the hangar more attractive to a buyer.

Paragraph 14 provides in pertinent part that:

Landlord and its agents shall further have the right to exhibit the Premises and to display the usual "for sale", "for rent" or "vacancy" signs on the Premises at any time within forty-five (45) days before the expiration of this Lease.

Thus, the lease allowed Zerbe to exhibit the premises for sale beginning on May 1, 2016, which was 45 days before the expiration of the lease on June 15, 2016. The lease did not speak to advertising the premises for sale in other ways other than exhibiting the premises or displaying the usual "for sale" signs on the premises.

The record is not entirely clear if and when Zerbe exhibited the premises for sale. It is also not clear what premature advertising Collette is referring to, or if Collette is using the term "advertising" synonymously with "exhibiting." Evidence presented at trial suggested that Zerbe signed documents to sell the property on or about April 16, 2016, before the eviction and before the time allowed to exhibit the premises in paragraph 14.

Collette further claims that Zerbe breached the lease or committed a tort by disrupting the building process. It is not entirely clear what Collette means by "disrupting the building process." Since Collette raises the premature advertising claim along with the disrupting the building process claim, it appears Collette is asserting that Zerbe's act of prematurely advertising or exhibiting the premises disrupted the construction of the buildings. Collette, though, failed to present sufficient credible evidence to establish that any act of advertising or exhibiting the premises by Zerbe disrupted the process of constructing the buildings. For these reasons,

Collette failed to establish that Zerbe breached the lease or committed a tort by either advertising the hangar for sale before the contract allowed, or by disrupting the building process.

*Zerbe breached the lease and committed a tort by claiming the buildings as his own property and attempting to sell them.*

Collette claims that Zerbe breached the lease and committed a tort by claiming ownership of Collette's buildings and then attempting to sell them. Zerbe asserts that he was entitled to seize the buildings and claim them as his own under two theories. First, Zerbe asserts that Collette abandoned the premises, and therefore, the buildings left in the hangar became his.

Paragraph 19 provides in pertinent part that:

> If Landlord's right of reentry is exercised following abandonment of the Premises by Tenant, then Landlord shall consider any personal property belonging to Tenant and left on the Premises to also have been abandoned, in which case Landlord may dispose of all such personal property in any manner Landlord shall deem proper and Landlord is hereby relieved of all liability for doing so.

As discussed later in this decision, Collette never abandoned the premises, which includes the hangar. Thus, Zerbe could not seize Collette's property, including the buildings, for an abandonment that never occurred.

Secondly, Zerbe asserts that he was entitled to seize the buildings and claim them as his own under the common law theory of distraint. The law of distraint (or "distress" as it is sometimes referred to) protects landlords from defaulting tenants and allows a landlord to go on to the leased premises and take any chattel found there as security for the overdue rent.[32] It is unclear if distraint is even a remedy for

---

[32] Shane J. Osowski, *Alaska Distress Law in the Commercial Context: Ancient Relic or Functional Remedy?*, 10 ALASKA L. REV. 33, 35 (1993) (internal citations omitted); *Bickel v. Polaris Inv. Co.*, 155 F.Supp. 411 (D. Alaska Terr. 1957).

commercial landlords under Alaska law. The supreme court has not directly ruled on the question,[33] and distraint has been abolished for residential leases.[34] However, even if the remedy is available to commercial landlords, a clear prerequisite for distraint is overdue rent.[35] This prerequisite is not present here, therefore Zerbe cannot claim a valid use of distraint. As detailed above, Collette's refusal to pay Zerbe double rent based on Zerbe's unilateral, no-basis-in-the-lease demand is not a failure to pay rent. Collette was up to date on all rental payments required by the lease and the court finds that Zerbe was not entitled to distrain Collette's property.

Accordingly, Zerbe had no legal right to hold Collette's property and is liable for trespass, as detailed in the above section regarding Collette's claim for trespass.

*Zerbe did not threaten to forcibly dismantle the buildings.*

Collette claims that Zerbe breached the lease or committed a tort by threatening to forcibly dismantle the buildings. Collette presented no credible evidence that Zerbe ever threatened to forcibly dismantle the buildings. Zerbe seized them, damaged them, and claimed them as his own, but he did not threaten to dismantle them. Even if such a threat was made, however, it was not carried out. Nor is there any credible evidence that the alleged threat breached the lease or caused any damages. Accordingly, Collette has failed to prove this claim.

*Zerbe did not breach the lease or commit a tort by surveilling Collette and his employees.*

Collette claims that Zerbe breached the lease or committed a tort by surveilling and intimidating Collette and his employees. Collette further asserts that

---

[33]     *See* Osowski, *supra* [note 32], at 52 (citing *Klosterman v. Hickel Inv. Co.*, 821 P.2d 118, 126 n.16 (Alaska 1991)).

[34]     AS 34.03.250(b).

[35]     Osowski, *supra* [note 32], at 37.

the surveilling and alleged intimidation slowed down the process of constructing his buildings and relocating them.

Insomuch as Collette asserts that Zerbe's acts of surveilling Collette or tattling to DOT slowed down the building process, Collette has failed to present sufficient credible evidence to support this claim. Although Zerbe surveilled Collette's crew while they were clearing land for the relocation of the buildings, this act was neither unlawful, tortious, nor a breach of the lease. Additionally, Collette failed to present any credible evidence that Zerbe engaged in any intimidation of Collette, or that any alleged intimidation slowed down the building process.

The same is true with regards to Collette having difficulty relocating his buildings. Zerbe was within his rights to inform DOT that Collette was attempting to construct an illegal driveway. That this report and the subsequent scrutiny it invited from DOT caused Collette to jettison his land clearing project to find another suitable location was neither a breach of the lease nor a tort. Accordingly, Collette has failed to prove this claim.

*Zerbe did not breach the lease or commit a tort by placing Collette's marijuana enterprise in jeopardy with the early eviction.*

Collette claims that Zerbe breached the lease or committed a tort by placing Collette's marijuana enterprise in jeopardy with the early eviction. Collette did not raise this claim until trial, yet spent considerable time at trial discussing this claim. Collette's claim is therefore waived, and also, even if he had included the claim in his pleadings, is without merit.

As stated above, Collette rented the hangar so he could construct buildings that he would later move to a different parcel of land and use to house his marijuana enterprise. By getting evicted early, and thereby not having functioning buildings to use, Collette alleges he was unable to start his marijuana enterprise when he planned to and, thus, missed out on profits. Yet Collette failed to present sufficient evidence of causation, the amount of lost profits, or suggest any means of calculating

such profits. It was proven at trial that Collette did not have a proper plot of land ready to move the buildings to even if the buildings were completed. Once Zerbe informed DOT that Collette was trying to construct an illegal driveway, Collette had to find another property. Only once Collette found that property and prepared it for the buildings would he have been able to move completed buildings there and begin his marijuana enterprise.

Moreover, it appears that Collette's marijuana enterprise was illegal during the time he is requesting damages for. Evidence at trial revealed Collette began growing marijuana *before* marijuana was legalized in Alaska to get a jump start on the competition once marijuana was legalized. Indeed, during Collette's first Marijuana Control Board inspection (at Collette's grow location, not in the hangar), 33 of Collette's marijuana plants were confiscated for being too tall — over 3 feet rather than the allowable 6 inches — which suggests Collette began growing the plants well before it was legal to do so. Put simply then, Collette is requesting to be compensated for money he would have made selling illegally grown marijuana. The court cannot award damages for illegality.

Accordingly, Collette has failed to establish this claim by a preponderance of the evidence.

*Zerbe did not enter into the lease agreement in bad faith.*

Collette claims that Zerbe breached the lease or committed a tort by entering into the lease agreement in bad faith. More specifically, Collette claims that Zerbe did not intend to go through with the lease provisions.

Evidence at trial established that nearly five months into an eight[*] month lease the parties began to have disputes over some of the lease provisions and conduct of the parties. There were no concerns raised by either party until DesJarlais returned to Fairbanks in March 2016 and took umbrage with what he saw inside the hangar. Soon thereafter Zerbe returned to Fairbanks to ascertain the situation and also took umbrage with what he saw.

As discussed in this decision, both parties breached the lease. Thus, both parties had reason to be unhappy with each other's actions. Indeed, Zerbe eventually made an ill-fated decision to evict Collette without just cause more than six months into the eight[*] month lease. It does not follow, however, that because Zerbe evicted Collette, he never intended to honor the lease when it was entered into. Neither has Collette presented any credible evidence that Zerbe never intended to honor the lease when it was entered into. Accordingly, Collette has failed to establish this claim by a preponderance of the evidence.

*Zerbe did not breach the lease or commit a tort by failing to secure the hangar and thereby putting Collette's belongings at risk.*

Collette claims that Zerbe breached the lease or committed a tort by failing to secure the hangar and thereby putting Collette's belongings at risk, presumably of theft. It is unclear what specific action or inaction allegedly taken by Zerbe amounted to failing to secure the hangar. If Collette is referring to the eviction, i.e., the act of removing the buildings from the hangar and locking Collette out, it does not follow that the belongings in the hangar were ever unsecured or placed at risk. Moreover, Collette failed to establish with any credible evidence that Zerbe ever left the hangar unsecured. The court finds just the opposite, that Zerbe always left the hangar secured. Zerbe had much more to lose from theft than Collette had the hangar been left unsecured. The lease provision preventing Collette from lending the hangar keys to his employees is just one example of the seriousness with which Zerbe took security of the hangar. Accordingly, Collette has failed to establish this claim by a preponderance of the evidence.

*Collette is not entitled to punitive damages.*

In addition to his breach of contract and tort claims, Collette seeks punitive damages. Punitive damages are a "harsh remedy 'not favored in law. They are to be

allowed only with caution and within narrow limits.' "[36] According to the Restatement (Second) of Torts, "[p]unitive damages are not awarded for mere inadvertence, mistake, errors of judgment and the like, which constitute ordinary negligence [but are restricted to] conduct involving some element of outrage similar to that usually found in crime."[37] Alaska law does not "permit punitive damages for breach of contract, except when 'the conduct constituting the breach is also a tort for which punitive damages are recoverable.' "[38] Punitive damages are allowed "only if the plaintiff proves by clear and convincing evidence that the defendant's conduct (1) was outrageous, including acts done with malice or bad motives; or (2) evidenced reckless indifference to the interest of another person."[39] If punitive damages are allowed, a separate proceeding shall be conducted before the same fact finder to determine the amount of punitive damages to be awarded.[40]

Here though, no separate proceeding is necessary because Collette has failed to prove by clear and convincing evidence that Zerbe's conduct was either outrageous or evidenced reckless indifference to Collette's interests. Collette proved the underlying torts of trespass and damaging the buildings by a preponderance of the evidence[;] however, Collette did not provide any evidence under the clear and convincing standard that Zerbe acted with outrageousness or reckless indifference

---

[36] *Chizmar v. Mackie*, 896 P.2d 196, 210 (Alaska 1995) (quoting *State Farm Mut. Auto. Ins. v. Weiford*, 831 P.2d 1264, 1266 (Alaska 1992)).

[37] *Pederson v. Barnes*, 139 P.3d 552, 563 (Alaska 2006) (alterations in original) (quoting *State v. Hazelwood*, 946 P.2d 875, 889 (Alaska 1997) (Compton, C.J., dissenting).

[38] *Reust v. Alaska Petrol. Contractors, Inc.*, 127 P.3d 807, 821 (Alaska 2005) (quoting *McKibben v. Mohawk Oil Co., Ltd.*, 667 P.2d 1223, 1232 (Alaska 1983)).

[39] AS 09.17.020(b).

[40] AS 09.17.020(a).

towards Collette's interests. Zerbe's actions do not rise to the level of outrage typically found in crime and the court will therefore not impose the harsh remedy of punitive damages.

## Zerbe's Claims

Zerbe alleges that Collette breached the lease in the following ways:

1. By constructing marijuana cultivation buildings in the hangar, Collette violated the provision to obey all laws because marijuana possession is a federal crime. Zerbe asserts that Collette cannot maintain an action for a criminal enterprise.

2. By subletting the back of the hangar [. . .] for the vehicle repair project.

3. By using over half the hangar space.

4. By leaving trash on the premises for extended periods; by spilling oil in the hangar; and by destroying or losing about $2,000 of Zerbe's personal property.

5. By manufacturing marijuana in the hangar.

6. By violating a Fairbanks North Star Borough ordinance that required notice to and written permission from Zerbe before constructing a marijuana cultivation building in an industrial-zoned area.

7. By violating a marijuana initiative statute that says no person shall be forced to participate in any marijuana enterprise.

8. By threatening to remove the large hangar door without notice to or consent from Zerbe, and by denying Zerbe the ability to preserve the building from threatened damage to the hangar door.

9. By obstructing the front windows with plywood.

10. By installing a new lock on the hangar man door with no notice to and permission from Zerbe and, as a result, by not allowing landlord to inspect the premises.

11. By denying Zerbe the ability to remove any alterations that did not

conform to the lease by building the buildings too tall, having two buildings in at once, and allowing [a] vehicle to remain in the hangar.

12. By attempting to hold Zerbe responsible for damages when the contract explicitly says the landlord shall not be liable for any damages.

13. By failing to remove his property after eviction "despite being in default and notified of eviction three times."

14. By providing keys to his agents, by hiding keys outside, and possibly duplicating keys.

15. By not allowing DesJarlais to continue to work on the hangar apartment improvements, thus committing tortious interference with the contract between Zerbe and DesJarlais.

16. By not allowing the Bobcat to be stored in the hangar.

*Collette's act of building structures in the hangar that were to be used in a licensed marijuana cultivation business at another location did not violate the lease provision to comply with all laws.*

Paragraph 5 governs the use of the premises and provides in pertinent part that:

> Tenant shall comply with any and all laws, ordinances, rules and orders of any and all governmental or quasi-governmental authorities affecting the cleanliness, use, occupancy and preservation of the Premises and property.

Zerbe argues that, since Collette was using the hangar to construct buildings that would later be used in a marijuana cultivation business at another location, Collette violated the provision to comply with all laws. Zerbe asserts that since possession of marijuana is illegal under federal law, it is irrelevant whether the buildings were being constructed for use in a subsequently approved state licensed marijuana business.

Zerbe's claim is without merit. Zerbe has failed to establish that Collette's act of constructing his buildings was in violation of any law, federal or

otherwise. Accordingly, Collette did not breach the lease by constructing the buildings.

Zerbe also asserts that Collette cannot maintain an action for a criminal enterprise. Although this assertion is correct, insomuch as Collette was constructing his buildings to be used in an approved and licensed marijuana cultivation business — that is a lawful business under state law — his act of leasing the hangar or constructing his buildings was not in furtherance of a criminal enterprise.

*Collette did not sublet a part of the hangar.*

Paragraph 5 governs the use of the premises and provides in pertinent part that:

> The Premises shall be used and occupied by agents for and employees of <u>John Collette</u>. This property is outside the city limits of Fairbanks and is zoned as heavy industrial area; therefore, any type business may be conducted on this property.

Additionally, paragraph 7 governs the assignment and subletting of the premises and provides in pertinent part that, "[t]enant shall not assign this Agreement, or sub-let or grant any license to use the Premises or any part thereof without the prior written consent of Landlord."

It is undisputed that when Collette allowed [his employee] to place his vehicle in the hangar he did not have the prior written consent of Zerbe. Zerbe argues that allowing [the employee] to place his vehicle in the hangar amounted to subletting a part of the hangar, which, without the written consent, was a breach of the lease.

The court disagrees. As stated in paragraph 7, the lease provides that the premises, which includes the hangar, shall be used and occupied by agents for and employees of Collette. Thus, the lease allowed for the use of the hangar by Collette's agents and employees, [. . .] so long as the use was authorized by Collette and did not violate other provisions of the lease. Nowhere in the lease is the tenant's use limited to constructing buildings. Collette did not sublet the lease, with or without

consent, when he allowed [the employee] to use a part of the hangar to store or work on his vehicle. Accordingly, Collette did not breach the lease by subletting.

*The lease did not limit Collette's use of the hangar to half of the available space.*

Zerbe asserts that the lease was for only half of the hangar's available floor space. Specifically, Zerbe asserts that the parties had an oral agreement that Collette would only build one building section at a time. According to Zerbe, each section was to be 12 feet wide by 36 feet long. When one section was completed, it would be removed from the hangar and then the other section would be constructed. Zerbe asserts that a 12 feet by 36 feet area was marked off with tape on the floor of the hangar and that all parties knew this was to be the footprint of Collette's building. Zerbe asserts that this orally-agreed-to-footprint would allow DesJarlais the workspace he needed to complete the apartment project and install the garage door. Zerbe presented witnesses to support his assertion of this oral agreement, including DesJarlais, who the court finds to have not been a credible witness on this and most disputed issues.

Collette denied that there was any such oral agreement limiting the use of the hangar space or the size of his buildings to 12 feet by 36 feet each. Collette testified that he would not have rented the premises if he could not construct both buildings simultaneously, and that he needed more than just half of the available space of the hangar to complete his project. The court finds Collette credible on this issue.

Additionally, Zerbe's claim that oral agreements limited Collette's use of the hangar floor space[*] contradicts the clear language of the lease. Specifically, paragraph 24 provides that the written lease "contain[ed] the entire agreement between the parties" and that the agreement "shall not be modified, changed, altered or amended in any way except through a written amendment signed by all of the parties hereto." Thus, upon entering into the lease the parties agreed that all the lease's provisions were in writing and could not be modified except in writing.

Paragraph 5 provides that "[t]he [p]remises shall be used and occupied by agents for and employees of <u>John Collette</u>." Nowhere does the lease mention that Collette's use and occupancy of the hangar is limited to half of the hangar's floor space or a certain footprint. Both parties concede that there is no signed written amendment that modifies, changes, alters, or amends Collette's use of the full available space of the hangar.

The court does not find any testimony which claimed that there were oral agreements in addition to the written terms of the lease to be credible. The court finds that the lease was a fully integrated contract. Accordingly, Zerbe has failed to prove by a preponderance of the evidence that Collette's use of more than half of the hangar space was a breach of the lease.

*Collette did not breach the lease by allowing trash to accumulate on the premises or by spilling waste oil in the hangar, nor did Collette destroy or lose Zerbe's personal property.*

Paragraph 11.b. governs trash disposal from the premises and provides in pertinent part that:

> At this time hangar does not have water or septic available, but both are available at the house on the property.
>
> Tenants shall at their own expense provide the following utilities or services:
>
> [. . . .]
>
> **b.** **Garbage disposal.** **Trash** — Tenants shall themselves dispose of garbage, transporting to public transfer station. Tenant shall not allow trash to accumulate outside the residence, and any of Tenants' possessions outside the premises shall be arranged in a neat and orderly fashion. Tenant agrees to promptly remove and dispose of trash to the transfer station so as to keep the property free of trash. In the event that Landlord had to remove Tenant's trash, **fee will be billed at $50 per occurrence.**

Zerbe asserts that Collette allowed trash to accumulate outside of the hangar on at least one occasion and this amounted to a breach of the lease. Zerbe's

assertion was supported by testimony and Defendant's Exhibit AD — a photograph of two bags of trash and some pieces of foam insulation outside of the hangar man door. It is unclear how long the trash had been "accumulating" at the location as depicted in Defendant's Exhibit AD. It could have been minutes, hours, or perhaps even days.

As an initial matter, paragraph 11.b. prohibits the tenant from allowing trash to accumulate outside the *residence,* not the hangar. Neither party established the location of the residence in question or whether tenant ever used a residence on the premises, let alone allowed trash to accumulate outside of the residence. That some residence existed on the premises in addition to the hangar seems likely in light of paragraph 11, which provides that the "hangar does not have water or septic available, but both are available at the house on the property."

Zerbe has not established that he had to dispose of tenant's trash, and is not claiming that he is entitled to the $50 fee for trash removal set out in paragraph 11.b. The court finds that Zerbe has failed to establish that the offending trash in Defendant's Exhibit AD was allowed to accumulate outside the residence. Additionally, Zerbe has failed to establish by a preponderance of the evidence that any trash was allowed to accumulate on the premises to the degree that a breach of the lease occurred, especially a material breach.

Zerbe also asserts that Collette breached the lease by spilling waste oil in the hangar. Paragraph 27 provides in pertinent part that "[t]enant may use all waste oil that is presently on the premises. Tenant shall keep in good working order . . . the waste burner and shall be responsible to pay for such upkeep." Additionally, paragraph 1 on handwritten page 5 provides in pertinent part that "[t]enant May [sic] use all the waste oil on premises to heat hangar and shall be responsible to Maintain [sic] waste oil system in good working order."

Evidence at trial established that the hangar was heated by a waste oil heater. Zerbe left a supply of waste oil for the tenant's use. The tenant was required

to keep the heater's indoor supply tank filled with the waste oil. To accomplish this, the hangar was equipped with a pump. On at least one occasion Collette or his agents failed to pay close attention while the pump was running, thus allowing the waste oil to overflow the supply tank and pour onto the hangar floor and some of Zerbe's property that was stored under the supply tank.

The amount of the waste oil that overflowed was around a gallon according to [the] testimony, which the court finds credible. Zerbe failed to prove by a preponderance of the evidence that the oil spill damaged any of his property or the amount of the alleged damages. Neither has Zerbe established that this single incident amounted to a breach of the lease, much less a material breach.

Zerbe also asserts that Collette breached the lease by destroying or losing about $2,000 of Zerbe's personal property. The court does not find that Collette destroyed or lost any of Zerbe's property, much less $2,000 worth. Accordingly, Zerbe failed to prove by a preponderance of the evidence that Collette breached the lease by destroying or losing Zerbe's personal property.

*Collette did not manufacture marijuana in the hangar.*

Zerbe claims that Collette breached the lease by manufacturing marijuana in the hangar. No evidence was presented at trial to establish this claim. It is undisputed that Collette constructed the buildings in the hangar for the purpose of growing marijuana under license at another location. These facts, however, do not equate to manufacturing marijuana in the hangar. Accordingly, Zerbe has failed to establish that Collette breached the lease by manufacturing marijuana in the hangar.

*Collette did not violate a Fairbanks North Star Borough ordinance that required notice to and written permission from Zerbe before constructing a marijuana cultivation building in an industrial-zoned area.*

Zerbe claims that Collette breached the lease by violating a Fairbanks North Star Borough (hereinafter, "FNSB") ordinance that required notice to and written permission from Zerbe before Collette could construct a marijuana cultivation building

in an industrial-zoned area. It appears that Zerbe is referring to FNSB Code 18.96.240(A)(2), which provides that "[a] commercial marijuana establishment may only be allowed with the written consent of the owner of the property." The relevance that the premises was located in an "industrial-zoned area" is unclear since FNSB Code 18.96.240(A)(2) does not limit the written consent requirement to properties located in an industrial zone.

Collette did not inform Zerbe that the buildings he was constructing in the hangar would eventually be used in a commercial marijuana establishment. Thus, it is correct that there was no written consent given by Zerbe. However, Collette was not using the premises for a commercial marijuana establishment. Collette was merely constructing buildings that would later be moved to another location not belonging to Zerbe and only then be used in a commercial marijuana establishment. Thus, Zerbe's written consent was not required under FNSB Code 18.96.240(A)(2). Accordingly, Collette did not breach the lease by constructing his buildings without obtaining any written consent pursuant to FNSB Code 18.96.240(A)(2).

*Collette did not force Zerbe to participate in a marijuana enterprise.*

Zerbe claims that Collette breached the lease by forcing Zerbe to participate in a marijuana enterprise. Zerbe's argument is that since he was not informed that Collette's buildings were being constructed to eventually be used in a commercial marijuana enterprise, Zerbe was therefore unwittingly forced to participate in the enterprise.

Collette's act of constructing his buildings did not amount to engaging in a marijuana enterprise. Thus, even if Zerbe was aware of what Collette's ultimate purpose for the buildings was, Zerbe's act of leasing his premises to Collette could not reasonably be construed as participating in a marijuana enterprise. The same is true if Zerbe did not know what the buildings were to be used for. Thus, Zerbe did not participate in a marijuana enterprise, by force or otherwise. Accordingly, the lease was not breached.

*Collette neither threatened to remove the hangar door, nor denied Zerbe the ability to preserve the hangar from threatened damage.*

Zerbe claims that Collette breached the lease by threatening to remove the hangar door without notice to or consent from Zerbe. Zerbe also claims that Collette denied Zerbe the ability to preserve the hangar from the alleged threatened damage to the hangar door. Both of these claims are without merit.

Collette constructed his buildings so that they could be removed from the hangar without having to remove the hangar door and without causing any damage to the hangar. The court finds that the buildings were not too tall to be removed from the hangar without causing any damage to the hangar and without the need to remove the hangar door. It was Zerbe and DesJarlais who believed the buildings were too tall to be removed from the hangar. They were mistaken.

Collette did not share Zerbe's and DesJarlais' concerns. Nevertheless, in an effort to appease Zerbe, Collette researched the possibility of removing the hangar door in order to create additional height for the removal of the buildings. Collette offered to pay Zerbe a bond of $8,000 in case the door removal resulted in any damage, but Zerbe declined the offer.

Collette never threatened to remove the hangar door. Indeed, there would have been no need for such a threat since Collette was confident in his ability to remove the buildings without the need to remove the hangar door. Collette's confidence was not misplaced, considering that Zerbe, on his own accord, and without justification, removed the buildings without removing the hangar door or causing any damage to the hangar.[41]

---

[41] At trial Zerbe claimed that he caused some minor cosmetic damage when he removed the buildings himself, but did not sufficiently elaborate or prove by a preponderance of the evidence that any damage occurred.

Zerbe also claims that Collette denied Zerbe the ability to preserve the hangar from the alleged threatened damage to the hangar door. It is unclear what Zerbe is asserting. Collette did not threaten any action that would have damaged the hangar door, including removal of the door. Collette did not prevent Zerbe from engaging in any of the actions that Zerbe undertook, including removing his buildings. Nor could Collette have prevented Zerbe's actions since Zerbe unilaterally and surreptitiously removed the buildings. Thus, Collette did not deny Zerbe the opportunity to preserve the hangar. Accordingly, Zerbe has failed to establish that Collette breached the lease.

*Collette did not obstruct the front windows with plywood.*

Paragraph 12 provides in pertinent part that:

> Tenant will, at its sole expense, keep and maintain the Premises and appurtenances in <u>good</u> and clean condition and repair during the term of this Agreement and any renewal thereof. Without limiting the generality of the foregoing, Tenant shall . . . [n]ot obstruct the windows or doors . . . .

Evidence at trial established that at least one of the hangar's windows was covered with plywood. Both parties deny being responsible for covering the window. Zerbe has the burden of proving by a preponderance of evidence that Collette, or his agents, placed the plywood over the window. Collette is just as credible as Zerbe on this issue, thus, Zerbe has failed to meet his burden. Moreover, even if the court had found that Collette covered the windows with plywood, this would not have amounted to a material breach of the lease. Neither was Collette ever told that he was in breach of the lease for obstructing any windows and given the opportunity to correct before he was evicted.

*Collette neither breached the lease by installing a new lock on the hangar man door, nor did he prevent Zerbe from inspecting the premises.*

Paragraph 8 governs alterations and improvements to the premises and provides that:

> Tenant shall make no alterations to the buildings or improvements on the Premises or construct any building or make any other improvements on the Premises without the prior written consent of Landlord. Any and all alterations, changes, and/or improvements built, constructed or placed on the Premises by Tenant shall, <u>unless otherwise provided by written agreement</u> between Landlord and Tenant, be and become the property of Landlord and remain on the Premises at the expiration or earlier termination of this Agreement.

Additionally, paragraph 6 on handwritten page 5 provides that "[n]o modifications or repairs shall be Made to Hangar without Landlords prior permission."

Zerbe claims that Collette breached the lease by installing a new lock on the hangar man door with no notice to and permission from Zerbe. Zerbe further claims that, as a result, he was not allowed to inspect the premises.

At trial evidence established that someone, or perhaps more than one person, entered the hangar on several occasions without Collette's permission. The interloper(s) would make coffee, eat Collette's and his crew's snacks, and leave a mess for Collette's crew to clean up. To stop the intrusions and thefts, Collette changed the lock to the hangar man door and provided a key within 48 hours to Zerbe. The intrusions and thefts then stopped. At no time did Collette's act of changing the lock prevent Zerbe from inspecting the premises.

Collette's act of changing the lock was reasonably necessary to protect his and Zerbe's property. The act did not interfere with Zerbe's rights as a landlord, nor did it violate the lease. Even if the act was considered a breach of the lease, it was not a material breach.

*Collette did not breach the lease by building the buildings too tall, by building both building halves at once, by allowing [the employee's] vehicle to remain in the hangar, or by denying Zerbe the ability to remove any alterations.*

Zerbe claims that Collette breached the lease by denying Zerbe the ability to remove any alterations that did not conform to the lease, by building the

buildings too tall, by having two buildings in the hangar at once, and by allowing [his employee's] vehicle to remain in the hangar. Some of these claims have already been addressed above. Collette did not construct the buildings too tall to be removed from the hangar. Neither did Collette breach the lease by constructing both building halves simultaneously. Nowhere in the lease was Collette restricted to building only one building half at a time. The court finds any testimony that the parties had an oral agreement that Collette would only construct one building half at a time to be not credible. Additionally, Collette did not breach the lease by allowing his employee [*] to keep his vehicle in the hangar.

With regard to Zerbe's claim that Collette denied Zerbe the ability to remove any alterations that did not conform to the lease, it is unclear to the court what alterations Zerbe is alleging. The buildings themselves were not alterations to the hangar. The changing of the lock on the hangar man door was neither an alteration that Zerbe was prevented from removing, nor a breach of the lease. The only other evidence of a possible "alteration" that was presented was the evidence of the two-by-fours that were used to brace the walls of Collette's buildings inside the hangar. These are visible in Defendant's Exhibits E, G, and QQ. The court does not find that these temporarily placed two-by-fours amount to an alteration of the hangar, let alone one that Zerbe was prevented from removing. No credible evidence was presented that Zerbe was denied the ability to remove any alterations that he had expressed a desire to remove. Accordingly, Zerbe has failed to establish that Collette breached the lease as alleged.

*The lease does not prohibit Collette from seeking or obtaining damages from Zerbe for the harm alleged in this case.*

Paragraph 17 provides that:

Landlord shall not be liable for any damage or injury of or to the Tenant, Tenant's family, guests, invitees, agents or employees or to any person entering the Premises or the building of which the Premises are a part or to goods or

equipment, or in the structure or equipment of the structure of which the Premises are a part, and Tenant hereby agrees to indemnify, defend and hold Landlord harmless from any and all claims or assertions of every kind and nature.

Zerbe claims this lawsuit itself is a breach of the lease because Collette is seeking damages. Zerbe argues that paragraph 17 shields him from liability for the damages that Collette alleges. This argument grossly distorts the meaning of paragraph 17. Although Zerbe may be shielded from some liability for damage to Collette, his guests, or his property, it does not give Zerbe the right to be the one who inflicts that damage. Under Zerbe's reading, paragraph 17 is a license to intentionally violate tenant rights and would permit Zerbe to, for example, take a sledgehammer to Collette's belongings, then turn around and say, "You cannot sue me for any of this damage because you agreed to hold me harmless." Such an argument is as incorrect as it is preposterous. Collette is not restricted from seeking redress for the claims he has raised. Collette has therefore not breached the lease by initiating this action.

*Collette did not breach the lease by failing to remove his property after eviction.*

Paragraph 18 provides that:

If Tenant fails to comply with any of the material provisions of this Agreement, other than the covenant to pay rent, or of any present rules and regulations or any that may be hereafter prescribed by Landlord, or materially fails to comply with any duties imposed on Tenant by statute, within seven (7) days after delivery of written notice by Landlord specifying the non-compliance and indicating the intention of Landlord to terminate the Lease by reason thereof, Landlord may terminate this Agreement. If Tenant fails to pay rent when due and the default continues for seven (7) days thereafter, Landlord may, at Landlord's option, declare the entire balance of rent payable hereunder to be immediately due and payable and may exercise any and all rights and remedies available to Landlord at law or in equity or may immediately terminate this Agreement.

Zerbe argues that Collette breached the lease by failing to remove his property after being evicted, "despite being in default and notified of eviction three times." This claim is without merit. First, Zerbe has not established that Collette was in default, i.e., that he failed to comply with any of the material provisions of the lease. It is unclear what alleged default Zerbe is referring to. If Zerbe is claiming Collette was in default because he did not pay double the rent required by the lease, this claim is without merit. Collette paid the required rent at all times. Secondly, Zerbe unjustly prevented Collette from retrieving his property, so he has no claim against Collette for any property that Collette was not allowed to remove. Finally, Zerbe did not notify Collette of eviction three times; rather, there were two eviction notices.[42]

*Collette did not materially breach the lease by hiding keys outside the hangar for use by his employees.*

Paragraph 27 provides that Collette may not give any spare keys to his employees or loan a key for any period of time. Collette acknowledged that he hid the keys to the hangar near the hangar door so that his employees could access the hangar and work on the buildings in his absence. Hiding the keys outside the hangar for his employees use amounted to giving or loaning the keys. This was a breach of the lease, but was not a material breach. The court will now explain the difference.

*When is a breach of a contract material?*

"[W]hether a breach is material is a question 'of degree, centering on the reasonable expectations of the parties, and a material breach is one that will or may result in the other party not receiving substantially what that party bargained for.' "[43] The Restatement (Second) of Contracts, relied upon by the [Alaska Supreme

---

[42] *See* Plaintiff's Exhibits 10 and 11.

[43] *State, Dep't of Nat. Res. v. Alaskan Crude Corp.*, 441 P.3d 393, 401 (Alaska 2018) (citing RESTATEMENT (SECOND) OF CONTRACTS § 241 (Am. Law Inst. 1981)).

Court],[44] lists circumstances that are significant to determining whether a failure to render or to offer performance is material, including:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated [in damages] for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform . . .will suffer forfeiture; (d) the likelihood that the party failing to perform . . . will cure his failure, taking account of all the circumstances including any reasonable assurances; [and] (e) the extent to which the party failing to perform . . . comports with standards of good faith and fair dealing.[45]

There is also a test under the Restatement (Second) of Property, which provides "a landlord may terminate a lease if the tenant fails to perform a promise and the landlord is thereby 'deprived of a significant inducement to the making of the lease [and] the tenant does not perform his promise within a reasonable period of time after being requested to do so.' "[46] This is a conjunctive test, meaning the absence of the first element is enough to find the breach immaterial.[47]

---

[44] *See Wirum & Cash, Architects v. Cash*, 837 P.2d 692, 708 (Alaska 1992) ("Thus, on remand the superior court should enter additional findings and conclusions as to whether [the breaches] . . . were material breaches of the parties' contract. RESTATEMENT (SECOND) OF CONTRACTS, § 237, comment d; § 241 (1981).").

[45] *Bachner Co. v. Dep't of Admin., Div. of Gen. Servs.*, 468 P.3d 703, 709 (Alaska 2020) (alterations in original) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 241 (Am. Law Inst. 1981)).

[46] *Id.* at 707-08 (alterations in original) (quoting RESTATEMENT (SECOND) OF PROPERTY: LAND. & TEN. § 13.I (Am. Law Inst. 1977)).

[47] *Id.* at 708.

Usually whether a breach is material is an issue of fact,[48] but other times a breached provision is "so obviously central to the purpose of the contract that materiality can be determined as a matter of law."[49] Because "every contract contains an implied term that the parties thereto will act honestly toward one another with respect to the subject matter of the contract," fraud and "other forms of intentional wrongdoing constitute material breaches of contract as a matter of law."[50]

Collette's act of loaning the keys to the hangar to his employees does not rise to the essence/significant inducement level discussed above. It was also not a reason for the eviction because Zerbe was not aware of this fact before the eviction. Even if Zerbe had been aware that Collette had loaned the keys, Zerbe would have first had to request that Collette remedy this situation before eviction. "The landlord may hold the tenant in default . . . for the tenant's failure to perform a promise contained in the lease *only if the landlord has requested the tenant to perform and given him a reasonable time to do so.*"[51]

Moreover, Collette's act of loaning the keys did not cause any damage to Zerbe. The keys were never duplicated, nor has it been established that any unauthorized person ever accessed the hangar, other than the interloper(s) who ate Collette's snacks. No other damages have been established by a preponderance of the evidence. **Accordingly, Zerbe is awarded nominal damages of $1.**

---

[48]     *Alaskan Crude*, 441 P.3d at 401.

[49]     *Id.* (concluding that premature termination of an oil lease and prompting the aggrieved party to suspend his own performance while awaiting reinstatement was so central to the patties' reasonable expectations that it could only be viewed as material).

[50]     *Alaska Interstate Constr., LLC v. Pacfic Diversified Inv., Inc.*, 279 P.3d 1156, 1173 (Alaska 2012).

[51]     RESTATEMENT (SECOND) OF PROPERTY: LAND. & TEN. § 13.1, cmt. h (Am. Law Inst. 1977) (emphasis added).

*Collette did not prevent DesJarlais from living in or working on the hangar, neither did Collette interfere with the contract between Zerbe and DesJarlais.*

Zerbe asserts that Collette's acts of moving DesJarlais' belongings, allowing [the employee's] vehicle in the hangar, and simultaneously constructing the buildings breached the lease. Specifically, Zerbe claims that Collette so cluttered the apartment and surrounding area that DesJarlais was unable to live in the hangar or complete the apartment project.

Paragraph 28 allowed DesJarlais to live in the hangar until the end of November 2015, so that he might work on the apartment project. This provision did not allow other people to live in the hangar, such as DesJarlais' family or other guests. Although DesJarlais and his family lived in the hangar at some point prior to Collette's tenancy, they moved out before Collette took possession of the premises on or about October 15, 2015. DesJarlais never returned to live in the hangar before the end of November 2015. Thus, Collette did not breach the lease when DesJarlais elected not to live in the hangar.

When the parties met to sign the lease, Zerbe told Collette that he was handwriting the additional page, which included handwritten paragraph 4, to clarify some provisions. Handwritten paragraph 4 allowed DesJarlais to "remain on premises and in the hangar until improvements are finished." This provision allowed DesJarlais to access the premises and hangar after November 30, 2015, in order to complete the apartment project. This provision did not, however, allow DesJarlais[*] or anyone else to live in the hangar. Paragraph 28 clearly allowed DesJarlais to live in the hangar until November 30, 2015. Handwritten paragraph 4, however, does not clearly state that DesJarlais may live in the hangar after November 30, 2015.

The court finds that by adding handwritten paragraph 4 to the lease, Zerbe intended to clarify that DesJarlais would only be working in the hangar after November 30, 2015, and not also living in the hangar. Even if "remain on premises and in the hangar until improvements are finished" is interpreted to mean that DesJarlais

could continue in the particular state he was in on November 30, 2015, it would not allow him to live in the hangar after the end of November 2015, since he never lived, or attempted to live, in the hangar during Collette's tenancy in October and November 2015.

Although DesJarlais returned to Fairbanks in March 2016 in order to resume work on the apartment project, he never informed Collette that he wanted to resume work or live in the hangar. Collette and [another witness] both credibly testified that they would have made room for DesJarlais to resume his project and would even have helped DesJarlais move his belongings from the apartment if he had asked. The court finds that Collette did not prevent DesJarlais from living in the hangar or working on the apartment project and, therefore, did not breach the lease.[52]

Zerbe also claims that Collette's act of preventing DesJarlais from living in the hangar or completing the apartment project amounts to tortious interference with the contract between Zerbe and DesJarlais. To prevail on an intentional interference with contract claim, Zerbe must prove: (1) the existence of a contract; (2) Collette was aware of the contract; (3) the contract was breached; (4) Collette's conduct was the cause of that breach; (5) the damages; and (6) Collette's conduct was not privileged.[53]

---

[52] Collette raised as an affirmative defense in his Answer to Zerbe's Complaint that "the floor of the hangar was limited due to personal belongings and garbage [belonging to Zerbe/DesJarlais]." No credible evidence was presented that any belongings or garbage belonging to Zerbe or DesJarlais interfered with Collette's use of the premises.

[53] *See Kinzel v. Discovery Drilling, Inc.*, 93 P.3d 427, 443 (Alaska 2004) (listing six elements of claim for intentional interference with contract).

It is undisputed that a contract existed between Zerbe and DesJarlais.[54] Zerbe, however, never informed Collette of the DesJarlais contract's existence until after this litigation commenced. Collette remained unaware of the contract at all relevant times. Additionally, as previously discussed, Collette did not prevent DesJarlais from living in or working in the hangar. Zerbe has also failed to establish that either Zerbe or DesJarlais breached the contract between themselves, or that Collette was the cause of any such breach. Thus, Zerbe has failed to prove at least three of the six required factors.[55] A failure to establish any one of the six is enough to defeat an intentional interference with contract claim.

*Collette did not breach the lease by not moving the Bobcat into the hangar.*

Paragraph 7 on handwritten page 5 provides that the Bobcat "shall be left in [the] hangar," but Zerbe did not leave the Bobcat in the hangar at the time Zerbe turned the premises over to Collette, nor was the Bobcat or its location discussed with Collette. Zerbe failed to establish that Collette knew of the Bobcat's location, or that Zerbe asked or directed Collette to move the Bobcat from some other location and place it in the hangar, rather than simply "leave" the Bobcat in the hangar. Consequently, the Bobcat was never in the hangar during Collette's tenancy. Neither Collette, nor his employees, ever touched or used the Bobcat. [Zerbe] has failed to establish that Collette breached the lease by not moving the Bobcat into the hangar. Neither has Zerbe established that the Bobcat was damaged by any action or inaction of Collette.

*Collette should not be held in contempt of court for any failure to properly serve Zerbe.*

Zerbe claims that Collette should be held in contempt for "multiple instances of lack of proper service and notice, dating back to the district court

---

[54]    *See* Plaintiff's Exhibit 5.

[55]    *See Kinzel,* 93 P.3d at 443.

proceedings." Collette was a self-represented litigant for the entirety of the case. Zerbe was represented by counsel during part of the case, but represented himself at trial. Neither party appeared to have read or at least understood the Rules of Civil Procedure. Both parties failed to competently and efficiently present their claims and defenses. Yet it was Zerbe who often cited to his own *pro se* status as an excuse for why he had failed to follow some simple rule or procedure that even a minimally competent self-represented litigant should have reasonably known.

Zerbe has failed to establish that Collette failed to properly or effectively serve Zerbe. Even if there were some deficiencies in service, the court finds that they neither prejudiced Zerbe, nor did they rise to a level that would justify a finding of contempt. Accordingly, Zerbe's request for the court to hold Collette in contempt is denied.

*Collette did not abandon the hangar or his property.*

Zerbe claims that he cannot be liable for any damages to Collette's buildings or property because Collette abandoned the hangar and his property, including the buildings. More specifically, Zerbe asserts that Collette abandoned the hangar and his property and was subsequently evicted as a result of the abandonment. Zerbe also asserts that abandonment occurred when Zerbe failed to retrieve his property after the eviction.

Paragraph 19 provides that:

> If at any time during the term of this Agreement Tenant abandons the Premises or any part thereof, Landlord may, at Landlord's option, obtain possession of the Premises in the manner provided by law, and without becoming liable to Tenant for damages or for any payment of any kind whatever. Landlord may, at Landlord's discretion, as agent for Tenant, relet the Premises, or any part thereof, for the whole or any part thereof, for the whole or any part of the then unexpired term, and may receive and collect all rent payable by virtue of such reletting, and, at Landlord's option, hold Tenant liable for any difference between the rent

that would have been payable under this Agreement during the balance of the unexpired term, if this Agreement had continued in force, and the net rent for such period realized by Landlord by means of such reletting. If Landlord's right of reentry is exercised following abandonment of the Premises by Tenant, then Landlord shall consider any personal property belonging to Tenant and left on the Premises to also have been abandoned, in which case Landlord may dispose of all such personal property in any manner Landlord shall deem proper and Landlord is hereby relieved of all liability for doing so.

Although the lease provides that property left on the premises after abandonment is also abandoned, Collette never abandoned the premises. Zerbe failed to present any credible evidence that Collette abandoned the premises. Indeed, Zerbe was aware that Collette was trying to clear a parcel of land so that he could remove the buildings and resolve the dispute he was having with Zerbe. Collette had also paid rent through May, 14, 2016. Accordingly, Zerbe was not entitled to evict Collette for abandonment.

*Collette did not encumber the sale of Zerbe's hangar.*

Zerbe claims that Collette encumbered the sale of Zerbe's hangar and caused Zerbe damages when [a potential buyer] decided not to buy the property for $350,000. Zerbe did not properly plead this issue, only claiming he "probably lost a big sale" at a hearing on July 17, 2016, in front of Judge Hammers, but addressed it at trial. Zerbe's claim is therefore waived, and also, even if he had included the claim in his pleadings, is without merit.

Zerbe's claim is without merit for two reasons. First, the court does not find [credible the testimony from a witness who] testified that he considered purchasing Zerbe's hangar for $350,000 until he decided against it due to Collette's "criminal notoriety" and the condition of the premises. [This witness's] testimony, however, was filled with inconsistencies: he claimed Zerbe said he would evict Collette, then he claimed Zerbe did not say he would evict Collette; he claimed Collette was six months

behind on rent, then claimed he did not know how long Collette had not paid rent; he claimed to talk with Zerbe throughout the summer of 2016 about buying the hangar before deciding in the fall of 2016 not to buy, yet Zerbe closed on a sale with another in the spring of 2016. Accordingly, the court finds [the witness] was never a serious buyer.

Second, even if [the witness] were a serious buyer, [his] personal dislike of Collette does not give Zerbe a cause of action (not to mention the lease was set to end in June 2016). Indeed, it is absurd to think that a buyer's personal dislike of a tenant would allow a seller to collect damages from that tenant. Accordingly, the court finds Collette did not interrupt a potential sale in any way.

*Neither party is entitled to an award of attorney fees.*

Zerbe requests attorney's fees pursuant to paragraph 20, which provides that:

> Should it become necessary for Landlord to employ an attorney to enforce any of the conditions or covenants hereof, including the collection of rentals or gaining possession of the Premises, Tenant agrees to pay all expenses so incurred, including a reasonable attorneys' fee.

An award of attorneys' fees under paragraph 20 is allowed if an attorney is needed to enforce any of the lease's "conditions or covenants," i.e., lease provisions. Although earlier in the litigation Zerbe was represented by an attorney, he elected to proceed to trial without an attorney. Zerbe has presented no credible evidence that he employed an attorney to enforce any of the lease provisions. Rather, Zerbe evicted Collette, without just cause, and hired an attorney not to enforce any lease provisions, but to defend against Collette's lawsuit. Additionally, since Collette timely paid all rentals that he was required to, Zerbe never employed an attorney to collect rentals that he was entitled to. Accordingly, Zerbe has failed to establish that he is entitled to any award of attorney fees under paragraph 20.

Moreover, as the non-prevailing party, Zerbe is not entitled to an award of attorney fees under Civil Rule 82. Collette is the prevailing party in this litigation, but has not requested an award of attorney fees. The court would not have expected such a request since, to the court's knowledge, Collette never sought the assistance of counsel in this case. Accordingly, no attorney fees will be awarded either party.

*Conclusion*

In sum, what Zerbe fails to understand is that the law, though it protects landlords' rights, does not permit them to evict and seize tenants' property at the slightest misstep. All of the breaches Zerbe alleges are either non-existent[*] or immaterial.

A separate judgment shall issue.

It is so ordered.

Dated at Fairbanks, Alaska this 9th day of June, 2021.

/s/

Thomas I. Temple
Superior Court Judge
